**IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO WESTERN DIVISION**

| | |
|---|---|
| **ROBERT C. STEIN,** | **CASE NO.:    3:15-cv-00112-JGC** |
| **Plaintiff,** | **Judge James G. Carr** |
| **vs.** | |
| **ATLAS INDUSTRIES, INC.,** | **MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **Defendant.** | |

John D. Franklin (0055359)
Diana Robinson (0086642)
WIDMAN & FRANKLIN, LLC
405 Madison Avenue, Suite 1550
Toledo, Ohio 43604
(419) 243-9005 – Telephone
(419) 243-9404 – Fax
john@wflawfirm.com
kera@wflawfirm.com

Attorneys for Plaintiff,
Robert C. Stein

Plaintiff Robert C. Stein respectfully requests this Court deny Defendant Atlas Industries, Inc.'s Motion for Summary Judgment as a reasonably jury, accepting all of Plaintiff's facts as true and drawing all legitimate inferences in favor of Plaintiff, could find from the facts in the record in favor of Plaintiff, as set forth in the attached Memorandum and supporting Affidavit. Furthermore, Plaintiff requests oral argument on his Memorandum in Opposition.

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………ii

TABLE OF AUTHORITIES…………………...…………………………………...…iv

SUMMARY OF ARGUMENT……………………………………………………….vii

MEMORANDUM………………………………………………………………...1

I.  STATEMENT OF FACTS………………………………………………..1

    A.  Mr. Stein's long and successful career with Defendant…………………………...1

    B.  Jordan Stein's medical history, Defendant's comments regarding the cost of Jordan's healthcare, and Defendant's knowledge of the cost of Jordan Stein's healthcare………………………………………………………1

        1.  Jordan Stein's medical history and his decline in 2013…………........…1

        2.  Defendant's comments to Mr. Stein about the cost of Jordan's Healthcare and its effect on the company…………………………………2

        3.  Defendant's knowledge of Jordan Stein's high healthcare costs in 2013 and Defendant's significant changes to its plan design and stop-loss coverage in 2014…………………………………………………...5

    C.  Mr. Stein's workplace injury and Defendant's failure to work within his restrictions…………………………………………………………………7

    D.  Mr. Stein's abrupt termination……………………………………………….....8

II.  LAW AND ARGUMENT………………………………………………...9

    A.  Summary Judgment Standard………………………………………………..9

    B.  A reasonable jury could find Mr. Stein can establish a prima facie Case of FMLA Interference, FMLA Retaliation, ERISA Retaliation, and Workers' Compensation Retaliation……………………………………...10

        1.  Mr. Stein can establish a prima facie case of FMLA Interference....……10

            a.  A reasonable jury could find Defendant denied Mr. Stein benefits under the FMLA by terminating him for missing three consecutive days of work when those days constituted FMLA qualifying leave…………………………………………...11

b.    A reasonable jury could find Defendant denied Mr. Stein benefits under the FMLA by requiring him to return to light duty work prior to the end of the expiration of his FMLA leave……………………………………………………...13

2.    Mr. Stein can establish a prima facie claim for FMLA retaliation………15

3.    Mr. Stein can establish a prima facie case of ERISA retaliation……..…17

a.    Mark Toeppe, Steve Clark and Kay Miller had knowledge of Jordan Stein's healthcare costs and expressed concern over those costs…………………………………………..……18

b.    Temporal proximity exists to support an inference of ERISA retaliation………………………………………....20

4.    Mr. Stein can establish a prima facie case of retaliation under R.C. 4123.90………………………………………………..……22

C.    A reasonable jury could find Defendant's proffered reason for Mr. Stein's Termination is merely pretext for retaliation and/or discrimination…………...25

1.    Mr. Stein is not comparable to other employees terminated under the three-day no call/no show rule…………………………...……26

2.    Defendant did not call Mr. Stein on July 21, 2014, the day Defendant expected him to return from leave, but has called other employees when they did not show up to work when expected………………...…27

3.    Defendant did not have light-duty work available for Mr. Stein On July 21, 2014……………………………………………...…..28

III.    CONCLUSION…………………………………………………..……29

CERTIFICATE OF SERVICE…………………………………………………...…30

iii

# TABLE OF AUTHORITIES

## **Cases:**

*Abramson v. William Paterson College of New Jersey*, 260 F.3d 338 ( 3rd Cir. 2001)…………10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………………………………………..…..9

*Barger v. Jackson, Tennessee Hosp. Co., LLC*, 92 F. Supp.3d 754 (W.D. Tenn. 2015)……..…11

*Bryson, supra*, 498 F.3d at 571……………………………………………………………….……16

*Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713 (6th Cir. 2003)………………………………...11

*Celotex Corp. v. Catret*,  477 U.S. 317 (1986)……………………………………………………9

*Cherry v. Menard, Inc.*, 101 F.Supp 2d 1160 (N.D. Iowa 2000)…………………………...…….10

*Clark v. Walgreen Co.*, 424 Fed.Appx. 467 (6th Cir. 2011)……………………………...…….16

*Cundiff v. Lenawee Stamping Corp.*, 597 Fed.Appx. 299 (6th Cir. Jan. 7, 2015)……….……12,13

*Davison v. Roadway Express, Inc.*, 562 F.Supp.2d 971 (N.D. Ohio 2008)……………...…….16

*Deleon v. Kalamazoo County Road Com'n*, 2014 WL 114016 (6th Cir. Jan. 14, 2014)……..…...9

*DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004)……………………………………….…..…….16

*EEOC v. Avery Dennission Corp.*, 104 F.3d 858 (6th Cir. 1997)………………….….……...16

*Evanoff v. Banner Mattress CO.*, No 3:07cv1754, WL 4983300 (N.D. Ohio Oct. 21, 2008)…...17

*Gallagher v. Delaney*, 137 F.3d 338 (2nd Cir. 1998)………………………………………….10

*Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313 (3rd Cir. 2000)………………...……9

*Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623 (6th Cir. 2008)………………..…….17

*Hoffman v. CHSHO, Inc.*, 2005 Ohio 3909……………………………………………...…….22

*Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238 (6th Cir. 2004)……………………………...…10

*Hohn v. Deco Tools, Inc.*, 6th Dist. Lucas County L-86-119, 1987 WL 5554 (Jan. 23, 1987)..…22

*Hunt v. Cromartie*, 526 U.S. 541 (1999)…………………………………………………...…10

*Kent v. Chester Labs, Inc.*, 144 Ohio App.3d 587 (1st Dist. 2001)…………………………………22

*Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549 (6th Cir. 2006)……………………...…15

*Manzer v. Diamond Shamrock Chemical Co.*, 29 F.3d 1078 (6th Cir. 1994)……………….…..25

*Morr v. Kamco Industries, Inc.*, 548 F.Supp.2d 472 (N.D. Ohio 2008)………………....…12,13

*Pettit v. Steppingston, Center for the Potentially Gifted*, 429 Fed.Appox. 524 (6th Cir. 2011)….16

*Potts v. Nat'l Healthcare, L.P.*, 961 F.Supp. 1136 (M.D. Tenn. 1996)…………………………18

*Randleman v. Dick Masheter Ford, Inc.*, 10th Dist Franklin County, 1991 WL 224433
    (Aug. 22, 1991)………………………………………………………………………...22

*Reeves v. Standerson Plumbing, Inc.*, 530 U.S. 133 (2000)………………………………………9

*Rice v. Kellermeyer Co.*, 2013 WL 3532962 (N.D. Ohio July 15, 2014)…………………..…….16

*Scalia v. Aldi, Inc.*, 2010 Ohio 5657…………………………………………………….………..23

*Srouder v. Dana Ligh Axel Mfg., LLC*, 725 F.3d 608 (6th Cir. 2013)…………………………….12

*State ex rel. OmniSource Corp. v. Indus. Comm.*, 2007 Ohio 1951……………….…..…………25

*State ex rel. Price v. Indus. Comm.*, 2010 Ohio 2976…………………………………………….24

*Stewart v. Rutgers University,* 120 F.3d 426 (3rd Cir. 1997)………………………………….…..9

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014)………………………………………………....…….10

*Wilson v. Riverside Hospital*, 18 Ohio St.3d 8 (1985)…………………………..……………….22

**Statutes and Law:**

29 C.F.R  §825.220(c)………………………………………………..…………….11

29 C.F.R. §825.220(d)……………………………………………………..……………….14

29 C.F.R. 825.702 (d)(2)…………………………………………………………………….14

29 C.F.R. 825.207 (e)……………………………………………………………...……….14

29 U.S.C. §1140………………………………………………………………..…………...17

29 U.S.C. §2615(a)(1)…………………………………………………...………………………10

Fed. R. Civ. P. 56(c)…………………………………………………………………………….9

Ohio Adm. Code 4121-3-32 (A)(6)…………………………...……………………………24

O.R.C. §4123.90……………………………………………...…………………………22,23

## SUMMARY OF ARGUMENT

Defendant Atlas Industries, Inc. ("Defendant") abruptly terminated long-term employee Plaintiff Robert C. Stein ("Mr. Stein") on July 25, 2014 while he was on FMLA-approved medical leave for a work-related knee injury over which he filed a workers' compensation claim and only months after his son received hundreds of thousands of dollars in medical benefits from Defendant's self-insured health plan. While Defendant claims it terminated Mr. Stein for violating its three-day no call/no show policy, a reasonable jury could find Defendant terminated Mr. Stein in retaliation for taking FMLA leave, in retaliation for his son's high healthcare costs and to interfere with his future benefits under the plan, and/or in retaliation for pursuing a workers' compensation claim for his knee injury. A reasonable jury may also find Defendant interfered with benefits to which Mr. Stein was entitled under the FMLA.

With regard to the FMLA interference and retaliation claims, a reasonable jury could find Defendant interfered with benefits to which Mr. Stein was entitled under the FMLA and retaliated against Mr. Stein for taking FMLA leave. It is important to note Mr. Stein was terminated while he was still on FMLA-protected leave. Mr. Stein was terminated on July 21, 2014, even though he was eligible for FMLA leave through August 5, 2014. While Defendant contends Mr. Stein's leave ended on July 21, 2014, when he was released to return to light-duty work, the FMLA does not require employees to return to anything other than their former position and employees must be given the option of returning to work with restrictions or of continuing to stay off work on FMLA leave. Defendant did not give Mr. Stein these options.

With regard to the ERISA retaliation claim[1], a reasonable jury could find the decision-makers in Defendant's termination knew about Mr. Stein's son's high healthcare costs and that the decision-

---

[1] Defendant did not move for summary judgment on Mr. Stein's ERISA interference claim so it is not addressed in this brief and should not be considered at the summary judgment stage.

makers were motivated to terminated Mr. Stein, at least in part, in retaliation for his son's high healthcare claims. Two of the individuals that played a role in Mr. Stein's termination made statements reflecting their concern over Mr. Stein's son's healthcare costs and significant changes were made to the healthcare plan's stop-loss coverage and plan design shortly after Mr. Stein's son incurred "astronomical claims."

Finally, with regard to Mr. Stein's workers' compensation retaliation claim, a reasonable jury could find Mr. Stein was terminated in retaliation for filing and pursuing a workers' compensation claim for the knee injury he sustained at work. Defendant refused to meet Mr. Stein's restrictions prior to going on leave for surgery and showed hostility to Mr. Stein for asking Defendant to work within his restrictions. Additionally, Defendant's stated reason for terminating Mr. Stein is nonsensical under Ohio's workers' compensation statute.

A reasonable jury could find Defendant's proffered reason for terminating Mr. Stein is pretext for unlawful discrimination and/or retaliation, since (1) Defendant provides no evidence that Mr. Stein is comparable to other employees terminated under the three-day no call/no show rule; (2) Defendant did not call Mr. Stein on the first day he missed even though Defendant has called other employees for not showing up to work when expected; and (3) Defendant did not actually have light-duty work available for Mr. Stein on July 21, 2014.

As is more fully explained in the Memorandum below, summary judgment is inappropriate with regard to all of Mr. Stein's claims as genuine issues of material fact exist and a reasonable jury could find in favor of Mr. Stein on all of his claims.

## MEMORANDUM

### I.  STATEMENT OF FACTS.

A.  Mr. Stein's long and successful career with Defendant.

Throughout his almost twenty years of employment with Defendant Atlas Industries, Inc. Mr. Stein received positive performance evaluations, was awarded regular wage increases, and had a nearly nonexistent disciplinary record. [Toeppe Depo., 84: 18 – 96: 23; Ex. 1; 169: 2-19; Ex. 7]. Mr. Stein was a reliable employee who routinely agreed to work overtime and received perfect attendance awards on more than one occasion. [Toeppe Depo., 199: 3-6; 160: 23 – 161: 19; Ex. 4; Ex. 6]. Mr. Stein started his career at Defendant Atlas Industries, Inc. on August 5, 1996 as a Drill Operator. [Stein Depo. #1, 11: 23 - 12: 1]. After holding several positions with Defendant over the next eight years, Mr. Stein entered Defendant's apprenticeship program to become a Machinist, which involved full-time on the job training as well as attending classes at night. At the end of the four-year program, Mr. Stein was promoted to the position of Journeyman Machinist. [Stein Depo., 10: 15 – 11: 14].

B.  Jordan Stein's medical history, Defendant's comments regarding the cost of Jordan's healthcare, and Defendant's knowledge of the cost of Jordan Stein's healthcare.

1.  *Jordan Stein's medical history and his decline in 2013.*

On December 3, 2002, Mr. Stein's son, Jordan Stein ("Jordan"), was born. [Stein Depo. #2, 100: 21-22]. When Jordan was approximately three months old, Jordan began experiencing serious medical issues. He would stop breathing, would turn red, and would seize. [*Id.* at 102: 18 – 103: 9]. In approximately March 2003, after a period of hospitalization, Jordan was diagnosed with having seizures and Cerebral Palsy. [*Id.* at 101: 20 – 102: 1]. Because of these conditions, Jordan, now fourteen, has only reached the developmental milestones of an average five-month old. [*Id.*]. For

1

several years after his diagnosis, Jordan's condition, while serious and requiring treatment with medications and round-the-clock care by family members, was stable. Mr. Stein, divorced from Jordan's mother, has joint custody of Jordan and is his primary caregiver Friday-Sunday. [*Id*. 108: 9-13].

On January 24, 2013, Jordan was hospitalized for a serious bout of pneumonia. [Stein Depo. #2, 112: 15 - 113 -6]. On January 25, 2013, Jordan was hooked up to a ventilator because he was unable to breathe on his own. [*Id*. at 112: 7-14]. Jordan remained hospitalized and on the ventilator for approximately 8-12 weeks. [*Id*. at 114: 1-7]. During that hospital stay Jordan also suffered from a serious complication when a central line was placed in his neck. [*Id*. at 114: 8-19]. The complication caused Jordan to go into cardiac arrest. As Mr. Stein explained it, "He was gone and they brought him back." [*Id*.]. After a nearly three-month hospitalization, Jordan was released to go home in April 2013. [*Id*. at 114: 20-24].  However, that discharge was short-lived, as Jordan was life-flighted back to the hospital only four days later and placed back on the ventilator. [*Id*. at 115: 1-23]. He received care in the hospital for 3-4 weeks before being discharged home. [*Id*.]. From May 2013-October 2013, Jordan was able to receive the care he needed at home, which included nebulizer treatments, wearing a vest four times a day to vibrate his chest, and seventeen medications. [*Id*. at 118: 8 -119: 7]. In November 2013, Jordan was again hospitalized. [*Id*. at 119: 8-13]. This time, he was placed on a ventilator for 5-8 days, and the hospitalization lasted for 3-4 weeks. [*Id* at 119: 14 - 120: 15].

2. *Defendant's comments to Mr. Stein about the cost of Jordan's healthcare and its effect on the company.*

Jordan Stein was covered as a dependent under Defendant's healthcare plan throughout 2013 and 2014. [Stein Depo. #2, 97: 11-17]. Defendant maintains a self-insured healthcare plan, which means Defendant pays for participants' medical claims as they are incurred instead of paying a fixed

premium to an insurance carrier. It was common knowledge that Defendant's healthcare plan was self-insured. [Toeppe Depo., 190: 10-21; M. Clark Depo., 40: 6-8; Ex 16; Ex. 38; K. Miller Depo. #2: 69: 1-17]. In 2013, both employees and members of management began making comments to Mr. Stein about the cost of his son's healthcare. Steve Clark, Vice President of Operations and part-owner, complained to Mr. Stein about Jordan's healthcare costs in or around March 2013. During a conversation about Jordan's hospitalization, Mr. Stein mentioned that it was costing him $150 in gas a week to see Jordan in the hospital, and Steve Clark's response was "Believe me, Rob, it's getting expensive for all of us." [Stein Depo. #2, 133: 1-21]. Again, in May 2013, Steve Clark vented his frustration with Jordan's healthcare costs. After Mr. Stein told Steve Clark that he hoped Jordan would be out of the hospital soon, Steve Clark said, "We all do, because it is getting kind of costly." [Stein Depo. #2, 135: 1-18].

Additionally, in or around March 2013, Kay Miller, Director of Human Resources, contacted Mr. Stein on four occasions to ask for a copy of Mr. Stein's divorce papers. She said she needed to determine whether Mr. Stein was responsible for covering Jordan's healthcare. Kay Miller insisted that it was important for him to get her that paperwork "to protect [Atlas] because it was getting very costly." [Stein Depo. #2, 138: 7-34]. Kay Miller also expressed Defendant's concerns about Jordan's healthcare costs to employee Lee Reimer, who is Jordan's grandfather. In June 2013, Lee Reimer met with Kay Miller to discuss his options with healthcare and to determine whether he could get Medicare Part B insurance. After Lee Reimer mentioned that the cost of healthcare to employees had been increasing, Kay Miller "pulled out papers and said, 'This is why our health insurance is going up. We have had three astronomical payouts.'" [Affidavit of Lee Reimer, 5-6]. Kay Miller showed him two documents: the first listed the costs of Lee Reimer's medical care including his hip

replacements and heart surgery, which totaled about $80,000.00; the second listed Jordan Stein's healthcare costs, totaling close to $1,000,000.00. [*Id.*].

Fellow employees also made comments to Mr. Stein as Defendant made it clear to its employees that its healthcare plan was self-insured, that high claims affected its bottom-line, and that the cost of health insurance to Defendant impacted whether employees would get raises and the amount of those raises. For example, in a notice posting in May 2012, Defendant reported to its employees, in relevant part, as follows:

> **Medical Benefits** – Some factors are out of our control. Since Obama care has been implemented, the cost of medical care has skyrocketed. Because we are self-insured these costs come directly from the Atlas bottom line and affect Atlas's ability to give rate increases.

(M. Clark Depo., Ex. 38). Again, in December 2012, Defendant provided a notice to its employees:

> **Medical Benefits** – Two factors have dramatically affected our benefits plan: Obamacare and our claims experience. Because of these factors effective 1/1/2013, we will have to implement a slight increase in the cost to our employees.

(S. Clark Depo., Ex. 16). In both 2013 and 2014, other employees made statements to Mr. Stein that they thought they would not be getting raises because of Jordan's healthcare costs. For example, Mr. Stein walked into a conversation with employees Duncan Harman, Bob Maynard, and Rick Smith on the shop floor. Mr. Stein heard Bob Maynard say, "It's Rob's fault." Then employee Duncan Harman said, "Yeah, gee, thanks, Rob, since your boy was in the hospital we're not going to get a raise." [Stein Depo. #2, 125: 1-23]. Finally, following Mr. Stein's termination, an employee Ray Hugill, told Mr. Stein that he was terminated for Jordan's healthcare costs and told Mr. Stein that he could probably be able to come back if he agreed not to cover Jordan on his insurance. [Stein Depo. #2, 161: 1-16].

4

3.  *Defendant's knowledge of Jordan Stein's high healthcare costs in 2013 and Defendant's significant changes to its plan design and stop-loss coverage in 2014.*

Defendant had knowledge of Jordan Stein's rising healthcare costs in 2013 and 2014. In addition to Steve Clark's and Kay Miller's comments to Mr. Stein about Jordan's healthcare costs, Defendant's records also show Defendant had knowledge of Jordan Stein's increasing healthcare costs. Defendant's healthcare committee, which consisted of Kay Miller, Maurice Clark, and Gerald Clark, received reports from its third party administer on a regular basis that included information on "High Claim Individuals." [M. Clark Depo., 131: 1 – 132: 12]. While names do not appear on the report, it is not difficult to figure out who the high claim individuals are based on the information that is provided. The report for the first quarter of 2013 shows Defendant paid $24,330.07 in healthcare costs for Jordan Stein during that quarter. [M. Clark Depo., Ex. 32]. The report for the second quarter of 2013 shows that in the first and second quarters, Defendant paid healthcare costs for Jordan Stein in the amount of $193,141.51. [M. Clark Depo., Ex. 33].

For the 2013 plan year, Defendant's healthcare plan had stop-loss coverage with a $250,000.00 deductible, meaning Defendant would be reimbursed by its stop-loss carrier for any claims an individual incurred after the plan paid out $250,000.00 for that individual in that plan year. [M. Clark, 74: 12-16; Ex. 24]. In other words, Defendant was required to pay all claims out of its general fund, even those in excess of $250,000.00. If any individual incurred claims over $250,000.00, Defendant could then apply for reimbursement with its stop-loss carrier for any claims over $250.000.00. [*Id.*]. In 2013, Defendant paid a total of $578,425.31 in claims on behalf of Jordan Stein. Defendant later applied for and was reimbursed for claims over $250,000.00. [M. Clark Depo., Ex. 28]. Maurice Clark admitted that high claims had an impact on the cash in the corporation. [M. Clark Depo., 71: 5-21].

In June 2014, only about a month before Mr. Stein's termination, Defendant changed its stop-loss coverage to lower its deductible level from $250,000.00 to $150,000.00. [M. Clark Depo., 107: 5 – 108: 17; Ex. 27]. When applying for the coverage, Defendant was required to provide to the insurer large claims reports, which are reports that list any individuals covered under the plan that incurred healthcare costs over $10,000.00 in a plan year. These reports, which were submitted to the insurance company in May 2014, list the plan as having paid $17,190.99 in the 2012 plan year, $564,692.40 in the 2013 plan year, and $134,421.59 from December 2013 until May 2014, for Jordan Stein's healthcare. [M. Clark Depo., Ex. 26]. For the 2013 plan year, Jordan Stein was the only individual with claims over the deductible amount. In fact, the person with the next highest claims history in the 2013 plan year had claims of $159,246.09, more than $400,000.00 less than Jordan Stein's healthcare costs. [*Id.*].

In January 2014, Defendant also significantly changed its plan design for its healthcare plan to lessen the costs to Defendant. [M. Clark, Ex. 18]. Previously, all employees were covered under the same schedule of benefits. [M. Clark, Ex. 17]. In January 2014, Defendant changed its plan to provide four different schedules of benefits from which employees could choose. [M. Clark, 57:15-24]. The changes resulted in decreased costs to Defendant and increased costs to employees. The chart below summarizes the deductible, coinsurance, and out-of-pocket maximums under the 2013 plan and under each of the 2014 plans:

|  | 2013 | 2014 Bronze | 2014 Silver | 2014 Gold | 2014 Platinum |
|---|---|---|---|---|---|
| Deductible | $415 individual/ $830 family | $3,500 individual/ $7,000 family | $2,500 individual/ $5,000 family | $1,000 individual/ $2,000 family | $500 individual/ $1,000 family |
| Coinsurance | 90/10 | 80/10 | 100/0 | 80/10 | 80/10 |
| Out of Pocket Max | $1,790 individual/ $3,580 family | $6,000 individual/ $12000 family | $2,500 individual/ $5,000 family | $4,500 individual/ $9,000 family | $2,500 individual/ $5,000 family |

These changes were effective immediately following Jordan Stein's year of expensive hospitalizations.

    C. <u>Mr. Stein's workplace injury and Defendant's failure to work within his restrictions.</u>

On December 23, 2013, Mr. Stein injured his left knee at work while on the shop floor. He stepped off a platform and turned to get a drill, and when he turned his foot caught a table and he twisted his knee. [Stein Depo. #1: 28: 2 – 29: 24]. Mr. Stein reported the injury to Eric Reuble and logged it in the first aid room. [*Id.* at 31: 11 - 32]. On January 8, 2014, Mr. Stein sought medical treatment at Healthlink, which is where Defendant sends its employees for treatment of work-related injuries. [*Id.* at 30: 18 -31: 2]. Following that appointment, Mr. Stein was released to return to work with restrictions. Mr. Stein's restrictions included the following: no lifting, no bending, no twisting, no turning, no lifting over 30-40 pounds, no kneeling, no squatting. [*Id.* at 34: 20 – 35: 5].

Even though Defendant was aware of his restrictions, Mr. Stein was routinely asked to and required to work outside his restrictions. He was often expected to do his normal job. Mr. Stein complained first to Jamie Halbisen and then to Mark Toeppe about being required to perform tasks outside his restrictions, but those complaints were mostly ignored. [Stein Depo. #1: 35: 6 – 36: 8; Toeppe Depo., 143: 7 – 155: 10]. At one point, Mark Toeppe told Mr. Stein that there were no jobs that could meet his restrictions and that he would not be sitting on his butt. [Stein Depo. #1, 71: 7-25].

On May 12, 2014, Mr. Stein was called up to Defendant's front desk to fill out leave paperwork to cover the time he would be off work following his surgery. [Stein Depo. #1, 54: 12-24]. He then filled out the paperwork provided to him. [*Id.* at 55: 18 – 57: 3]. Mr. Stein had knee surgery on May, 13, 2014. [*Id.* at 57: 6]. Following surgery, he regularly followed-up with his

7

physician and patiently awaited his release to return to work.

    D.  <u>Mr. Stein's abrupt termination</u>.

On July 18, 2014, Mr. Stein had a follow-up appointment to check the status of his recovery. He met Dr. Ebraheim's Physician Assistant, Gregory Otto. [Stein Depo. #1, 5-12]. During the appointment, Gregory Otto said to Mr. Stein, "Rob, I'm keeping you off until August 10th so they have – maybe have your shots approved. And if not, at that time, then maybe office work only. And when I say that, I say answering the phone only." [*Id.* at 66:6-10]. Gregory Otto then gave Mr. Stein a medical slip, like slips he had received at all other appointments, which Mr. Stein then took across the hall to the workers' compensation office. The slip is very difficult to read and was in Mr. Stein's possession for only a few minutes. [*Id.* at 42: 19 – 46:24; 88: 10-14; Page 3 of Exhibit H]. Mr. Stein left the appointment believing he was not released to return to work until August 10, 2014. [*Id.* at 16-24].

On July 24, 2014, Mark Toeppe called Mr. Stein at home and asked him to come into work so "we can discuss what we're going to do with you." [Stein Depo #1, 64: 2-13]. The following morning, on July 25, 2014, Mr. Stein went into work and met with Mark Toeppe and Brandon Clark. Mark Toeppe first explained that they had come up with work for Mr. Stein that would fit light duty restrictions. He then said that since Mr. Stein did not show up for work or call on July 21-July 23, he was being terminated. [*Id.* at 67: 3-10]. Mr. Stein was shocked considering he did not even know he was expected back to work and said "You're kidding me; you're going to do this to someone that's worked her for 20 years." [*Id.* at 2-25]. Mr. Stein then asked to see either Steve Clark, Vice President of Operations, or Kay Miller, Human Resources Director.

Steve Clark then entered the meeting and Mr. Stein again asked why they were doing this to him and said, "Do you really believe, Steve, if I was supposed to return to work on the 21st that I would not have been here." Mr. Stein also said, even if he was supposed to return, the description of work they provided did not meet his restrictions. Steve Clark then said, "They don't run us, we run us, we decide what we're going to do with you." [Stein Depo. #1, 69: 5-20]. At that point, the meeting was over and Mr. Stein left the premises.

## II.     LAW AND ARGUMENT.

### A.   Summary Judgment Standard.

Summary judgment is only proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catret*, 477 U.S. 317, 322 (1986).  "The burden is on the moving party to show that no genuine issue of material fact exists.  The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party." *Deleon v. Kalamazoo County Road Com'n*, 2014 WL 114016, *2 (6th Cir. Jan. 14, 2014) (internal quotations and citations omitted). In other words, "the evidence of the nonmovant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[A]lthough, the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Standerson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

Further, "summary judgment is generally not well suited for cases in which motive and intent are at issue and in which one party is in control of the proof." See also *Stewart v. Rutgers Univ.*, 120 F.3d 426, 431 (3d Cir. 1997); *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 321 (3d Cir. 2000); *Gallagher v. Delaney*, 137 F.3d 338, 343-44 (2d Cir. 1998); *Abramson v. William*

9

*Paterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001); *Cherry v. Menard, Inc*., 101 F.Supp.2d 1160, 1167 (N.D. Iowa 2000) (collectively holding that summary judgment should seldom be used in employment discrimination cases).

Even where the facts are not in dispute, summary judgment should be denied if competing inferences can be drawn regarding material issues. *Hunt v. Cromartie*, 526 U.S. 541 (1999) (where reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary judgment stage). As noted in a recent United States Supreme Court decision,

> witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences…the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Tolan v. Cotton*, 134 S.Ct. 1861, 1868 (2014). Thus, if the employer's evidence is contradicted, or comes from an interested witness, it cannot be credited unless it is favorable to the plaintiff. *Reeves*.

B. <u>A reasonable jury could find Mr. Stein can establish a prima facie case of FMLA Interference, FMLA Retaliation, ERISA Retaliation, and Workers' Compensation Retaliation</u>.

1. *Mr. Stein can establish a prima facie case of FMLA Interference*.

An employer is prohibited from interfering with, restraining, or denying an employee's exercise of any right under the FMLA. 29 U.S.C. § 2615(a)(1). Mr. Stein need only demonstrate that he was entitled to the benefit to succeed on his interference claim. *Hoge v. Honda of Am. Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir. 2004). The employer's intent is irrelevant to establishing Mr. Stein's FMLA interference claim. *Id.*

To establish his interference claim, Mr. Stein must demonstrate: 1) he is an eligible employee; 2) Defendant is an employer; 3) he was entitled to leave under the FMLA; 4) he gave Defendant notice of his intention to take leave; and 5) Defendant denied Mr. Stein FMLA benefits to which he was entitled. *Id.; Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). In this case, Defendant admits Mr. Stein can establish the first four elements and only takes issue with whether Defendant denied Mr. Stein benefits under the FMLA.

> a. **A reasonable jury could find Defendant denied Mr. Stein benefits under the FMLA by terminating him for missing three consecutive days of work when those days constituted FMLA qualifying leave**.

Defendant interfered with benefits to which Mr. Stein was entitled under the FMLA when it improperly disciplined him by counting his FMLA covered absences under its "no fault" attendance policy. The "FMLA's rule 'against interference prohibits…FMLA leave be[ing] counted under no fault attendance policies.'" *Barger v. Jackson, Tennessee Hosp. Co., LLC*, 92 F. Supp. 3d 754, Fn. 11, 772 (W.D. Tenn. 2015) (quoting 29 C.F.R. 825.220(c)). In this case, Defendant has a no fault attendance policy, which provides in relevant part: "Any associate who is absent three (3) consecutive days without permission or without calling in will be automatically discharged and it will be noted in your permanent record." (Miller Aff., 4, Ex. A). Mr. Stein was eligible for twelve weeks of FMLA leave starting on May 13, 2014. Thus, Mr. Stein was still covered under FMLA leave on July 21, July 22, and July 23.  Despite this, Defendant counted those FMLA covered absences against Mr. Stein under its three-day no call/no show rule and terminated him.

While Defendant argues an employer is permitted to impose and enforce notice and procedural requirements against an employee claiming FMLA-protected leave, a reasonable jury could find Defendant's call-in requirement did not apply to Mr. Stein. "[A]n employer may enforce

11

its usual and customary notice and procedural requirements against an employee claiming FMLA-protected leave, unless unusual circumstances justify the employee's failure to comply with the employer's requirements. *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 615 (6th Cir. 2013). In this case, a reasonable jury could find unusual circumstances exist to justify Mr. Stein's failure to call or return to work on July 21, 2014 because a material question of fact exists as to whether Mr. Stein knew or should have known he was released to return to work with restrictions on July 21, 2014.

Second, Defendant argues Mr. Stein should have informed Defendant if he desired extended leave, but a reasonable jury could find Mr. Stein did not have to request extended leave as his FMLA leave had not yet been exhausted. Defendant cites two cases *Cundiff v. Lenawee Stamping Corp.*, 597 Fed.Appx. 299 (6th Cir. Jan. 7, 2015) and *Morr v. Kamco Industries, Inc.*, 548 F.Supp.2d 472 (N.D. Ohio 2008), but those cases can be easily distinguished. The employee in *Cundiff* was not on FMLA protected leave prior to or at the time of his termination. Instead, the employee, without indicating any medical condition, failed to call-in or show up to work for a three-day period. After his termination, the employee attempted to submit a doctor's note to his employer to show the absences were FMLA-eligible. The Sixth Circuit found that "the FMLA did not give [the employee] the right to take leave on those days, which means that [the employer] did not interfere with his rights under that law when it refused to reinstate him." Unlike the employee in *Cundiff*, Mr. Stein provided notice to Defendant of his need to take FMLA leave prior to his surgery on May 13, 2014 and Defendant knew Mr. Stein was on FMLA-protected leave during the three days Defendant claims he violated the three-day no-call/no-show rule. Defendant knew Mr. Stein had been off work

12

for an FMLA-qualifying condition, whereas the employer in *Cundiff* had no way of knowing its employee was off work for a serious medical condition.

In *Morr v. Kamco Industries, Inc.*, 548 F.Supp.2d 472 (N.D. Ohio 2008), the employer has a policy that if an employee on an approved medical leave of absence requires an extension of that leave of absence, the employee must notify the company daily within thirty minutes of the start of the shift. The employee failed to notify the company of her extended leave and was terminated. Unlike the employee in *Morr*, neither Defendant nor his physicians gave Mr. Stein an FMLA ending date and Mr. Stein never informed the company that he was going to return on a specific date. In fact, Defendant did not have Mr. Stein fill out any FMLA paperwork and did not have Mr. Stein's physicians fill out any FMLA paperwork indicating an end-date for his FMLA leave. The light-duty release Mr. Stein received through the workers' compensation process did not affect the length of his FMLA-eligible leave or trigger the need to request an extension of his FMLA leave.[2] Thus, a reasonable jury could find that Mr. Stein had no obligation to request an extension of his FMLA leave, which had not yet expired.

> b. **A reasonable jury could find Defendant denied Mr. Stein benefits under the FMLA by requiring him to return to return to light duty work prior to the end of the expiration of his FMLA leave**.

Defendant denied Mr. Stein benefits under the FMLA by requiring him to return to light duty work on July 21, 2014. While Defendant argues that, under its policy, employees must return to work on the first regular workday following a medical release to work, the FMLA prohibits employers from requiring employees to return early from FMLA leave to perform light duty work. The following three FMLA regulations provide that employers cannot require an employee to return to

---

[2] This is more fully explained in the Section b. directly below this section.

light duty work prior to the expiration of FMLA leave, even if they are also covered by workers'

compensation laws. 29 C.F.R. 825.220(d) provides as follows:

> Employees cannot waive, nor may employers induce employees to waive, their prospective rights under FMLA. For example, employees (or their collective bargaining representatives) cannot trade off the right to take FMLA leave against some other benefit offered by the employer. This does not prevent the settlement or release of FMLA claims by employees based on past employer conduct without the approval of the Department of Labor or a court. Nor does it prevent an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a light duty assignment while recovering from a serious health condition. See 825.702(d). An employee's acceptance of such light duty assignment does not constitute a waiver of the employee's prospective rights, including the right to be restored to the same position the employee held at the time the employee's FMLA leave commenced or to an equivalent position. The employee's right to restoration, however, ceases at the end of the applicable 12-month FMLA leave year.

29 C.F.R. 825.702 (d)(2) states as follows:

> An employee may be on a workers' compensation absence due to an on-the-job injury or illness which also qualifies as a serious health condition under FMLA. The workers' compensation absence and FMLA leave may run concurrently (subject to proper notice and designation by the employer). At some point the health care provider providing medical care pursuant to the workers' compensation injury may certify the employee is able to return to work in a light duty position. If the employer offers such a position, the employee is permitted but not required to accept the position. See 825.220(d). As a result, the employee may no longer qualify for payments from the workers' compensation benefit plan, the employee is entitled to continue on unpaid FMLA leave either until the employee is able to return to the same or equivalent job the employee left or until the 12-week FMLA entitlement is exhausted. See 825.207(e). If the employee returning from the workers' compensation injury is a qualified individual with a disability, he or she will have rights under the ADA.

Finally, C.F.R. 825.207(e) provides in relevant part:

> If the health care provider treating the employee for the workers' compensation injury certifies the employee is able to return to a light duty job but is unable to return to the same or equivalent job, the employee may decline the employer's offer of a light duty job. As a result the employee may lose workers' compensation payments, but is entitled to remain on unpaid leave until the employee's FMLA leave entitlement is exhausted.

In this case, Defendant required, as a condition of continued employment, Mr. Stein to return to work with light duty restrictions on July 21, 2014. However, when an employee, like Mr. Stein, is on a work-related absence but is also covered under the FMLA, the employer cannot require the employee to return to light duty work. Rather, the employee has the choice of returning to light duty work or of remaining off work until the expiration of the FMLA leave period (without workers' compensation payments). Thus, pursuant to the regulations, Defendant, if it wanted Mr. Stein to return from FMLA leave on light duty on July 21, 2014, had the obligation to contact Mr. Stein and offer him a light duty position. Instead, Defendant refused to contact Mr. Stein because they "do not normally call people" and interfered with Mr. Stein's rights under the FMLA by requiring him to return to work with restrictions. [S. Clark Depo., 179: 1-22]. Thus, a reasonable jury could find Mr. Stein can establish a *prima facie* case of FMLA interference.

### 2. *Mr. Stein can establish a prima facie claim for FMLA retaliation.*

In order to establish a *prima facie* case of retaliatory discharge under the FMLA, Stein must demonstrate: "(1) []he was engaged in an activity protected by the FMLA; (2) the employer knew that []he was exercising [his] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). Here, Defendant concedes Mr. Stein can meet the first three elements, but denies a causal connection between the protected FMLA activity and the adverse employment action.

However, a reasonable jury could find a causal connection between the protected FMLA

15

activity and the adverse employment action. Mr. Stein's "burden in establishing a prima facie case is not intended to be an onerous one," but rather requires Mr. Stein to merely "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *Bryson, supra*, 498 F.3d at 571 (citations omitted); *EEOC v. Avery Dennisson Corp.,* 104 F.3d 858, 861 (6th Cir. 1997). In this case, Mr. Stein was terminated prior to the exhaustion of his FMLA leave and after he had been off work on FMLA leave for approximately ten weeks.

The Sixth Circuit has found temporal proximity satisfies the causal element of Stein's prima facie case of FMLA retaliation. *See DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)("where temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is indirect evidence, such as to permit an inference of their retaliation to arise"); *Pettit v. Steppingstone, Center for the Potentially Gifted*, 429 Fed.Appx. 524, 533 (6th Cir. 2011)(adverse action taken only 4 days after the plaintiff's protected activity "thus creat[ed] an inference of retaliation through temporal proximity"); *Davison v. Roadway Express, Inc.*, 562 F.Supp.2d 971, 983 (N.D. Ohio 2008)(finding a five-week gap sufficient to give rise to an inference of causality); *Clark v. Walgreen Co.*, 424 Fed.Appx. 467, 473 (6th Cir. 2011)("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters."); *Rice v. Kellermeyer Co*., 2013 WL 3532962 (N.D. Ohio July 15, 2014)("The close temporal proximity of [plaintiff's] request for FMLA paperwork and his termination is sufficient to establish the causal connection prong of his prima facie case.").

Defendant argues a reasonable jury could not find Plaintiff's termination was based on his FMLA leave simply because Plaintiff had used FMLA leave in the past without suffering an adverse

16

employment action. However, Mr. Stein had previously only ever taken intermittent FMLA leave for his son and usually only took off a day or two here or there to care for his son. [Stein Depo. #1, 51: 16-52: 6]. This was the first time Mr. Stein took extended consecutive days of leave under the FMLA. While Defendant did not take any adverse action in the past for using FMLA intermittent leave, a reasonable jury could still find Defendant terminated Mr. Stein for taking 10-12 weeks of consecutive leave.

       3. *Mr. Stein can establish a prima facie case of ERISA retaliation.*

       Under ERISA Section 510, it is "unlawful for any person to discharge…or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan…or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan…" 29 U.S.C. 1140. To state a *prima facie* case of ERISA retaliation, Mr. Stein must demonstrate: (1) he was engaged in activity protected by ERISA; (2) he suffered an adverse employment action; and (3) a causal connection exists between his protected activity and the employer's adverse action. *Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623 (6th Cir. 2008). Again, Defendant only argues Mr. Stein cannot prove the final element – that a causal connection exists between his protected activity and the adverse action.

      Further, Mr. Stein must show "through either direct or circumstantial evidence, that defendant[] 'had the specific intent to violate ERISA.'" *Evanoff v. Banner Mattress Co.,* No. 3:07CV1754, 2008 WL 4683300, at *9 (N.D. Ohio Oct. 21, 2008) (quoting *Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 537 (6th Cir. 2005). However, the "employee need not show that the employer's *sole* purpose for discharge was interference with the employee's benefits, but rather that

17

it was a 'motivating factor' in the decision.'" *Potts v. Nat'l Healthcare, L.P.*, 961 F. Supp. 1136, 1141 (M.D. Tenn. 1996).

In this case, a reasonable jury could find, with all reasonable inferences drawn in Mr. Stein's favor, that Jordan Stein's healthcare costs were a motivating factor in Mr. Stein's termination because (1) the decision-makers in Mr. Stein's termination had knowledge of Jordan Stein's monumental healthcare costs and expressed concern over those costs; and (2) temporal proximity exists to support an inference of retaliation.

### a. **Mark Toeppe, Steve Clark, and Kay Miller had knowledge of Jordan Stein's healthcare costs and expressed concern over those costs.**

Defendant claims Mark Toeppe was the sole decision-maker in Mr. Stein's termination and he had no knowledge of Mr. Stein's protected activity so there can be no causal connection. However, based on the facts in evidence, a reasonable jury could find: (1) Mark Toeppe did have knowledge of Jordan's high healthcare costs, and/or (2) Mark Toeppe was not the only decision-maker in Mr. Stein's termination and the other decision-makers had knowledge of Jordan's healthcare costs

A reasonable jury could find Mark Toeppe had knowledge of Jordan's healthcare costs. In his deposition, Mark Toeppe admitted to knowing about Jordan's illness. [Toeppe Depo., 188: 3-11]. He also acknowledged that there were times Mr. Stein left work because of emergency situations with Jordan. [*Id*. at 190: 1-9]. Further, Mark Toeppe knows Defendant has a self-insured healthcare plan and is provided with Defendant's Monthly Financial Reports. [*Id*. at 190: 10-24].  The Monthly Financial Reports include a report on medical costs for the period listed. The costs are broken down into categories by plant, hourly vs. salary, and employee vs. Dependent [M. Clark Depo., Ex. 29]. The Report covering the Plan Year of 12/1/2012-11/30/2013 shows that the medical claims costs for

18

dependents of Fremont hourly employees was $722,859.49 for that period. [*Id.*]. A reasonable jury could find Mark Toeppe had knowledge that a large portion of the dependent hourly medical expenses could be attributed to Jordan.

Second, a reasonable jury could find other individuals, including Steve Clark and Kay Miller, were also involved in Mr. Stein's termination and had knowledge of Jordan's healthcare costs. Both Mark Toeppe and Steve Clark's deposition testimony provide evidence that Steve Clark was involved in the decision to terminate Mr. Stein. Mark Toeppe testified that prior to the meeting with Mr. Stein on July 25, 2014, the decision to terminate Mr. Stein had already been approved. [Toeppe Depo., 193: 5-7]. Also, as Mark Toeppe explained, Steve Clark came into Mr. Stein's termination meeting and told Mr. Stein that the decision to terminate him was made based on the no call/no show policy in the rule book. [*Id.* at 200: 3-23].  A reasonable jury could find Steve Clark was the ultimate decision-maker in Mr. Stein's termination. Steve Clark explained his conversation with Mr. Stein at the termination meeting as follows:

> Well, basically Rob asked if I would overturn Mark Toeppe's decision to release him. And I said no, I can't, and in fairness to everybody else, this has been terminated under the three-day no call/no show, and that we have to keep equity and application of that rule. We can't just randomly, you know, decide when you apply it and when you don't.

Steve Clark's comments to Mr. Stein and his position as an Owner in the company provide proof that Steve Clark had knowledge of Jordan's healthcare costs and a reasonable jury could infer that the decision to terminate Mr. Stein was motivated, at least in part, by Jordan's high healthcare costs. Steve Clark admitted that since Defendant's healthcare plan is self-insured the company's bottom-line is affected by the amount of healthcare expenses. [S. Clark Depo., 141: 16-25]. Steve Clark is also involved in each year's general wage review meeting with other members of senior

19

management. At that meeting, Defendant decides whether it is going to give its employees a wage increase and considers healthcare costs in that decision. [*Id.* at 88: 2 – 91: 14]. In fact, Steve Clark drafts the annual General Notice on Benefits, which usually includes a section on Medical Benefits. [K. Miller Depo. # 3, 63: 12-22; 99: 15 – 104:17; Ex. 16; Ex. 38]. On more than one occasion, the General Notice on Benefits has referenced high claims experience and increasing medical costs as reasons for no or small wage increases. [M. Clark Depo., Ex. 38; S. Clark Depo., Ex. 16].

A reasonable jury could also find Kay Miller was involved in Mr. Stein's termination. Kay Miller received Mr. Stein's return-to-work paperwork and informed Mark Toeppe that Mr. Stein was to return-to-work on July 21, 2014 and that he should have light-duty work ready for Mr. Stein. [Toeppe Depo.,180: 1-24]. When Mr. Stein did not return to work on July 21, 2014, Kay Miller contacted Mr. Stein's physician's office as well as Defendant's Third Party Administrator for workers' compensation claims to verify that Mr. Stein was released to return to light-duty work on July 21, 2014. She then provided this information to Mark Toeppe. [Kay Miller Affidavit, 8]. Kay Miller, as a member of Defendant's healthcare committee, was intimately aware of Defendant's healthcare costs. Additionally, Kay Miller's comments to Lee Reimer provide evidence that Defendant's decision to terminate Mr. Stein was motivated by Jordan's healthcare costs.

### b. **Temporal proximity exists to support an inference of ERISA retaliation.**

A reasonable jury could find a causal connection between Mr. Stein's termination and Jordan's healthcare costs based on (1) the temporal proximity between Defendant's payment of Jordan's high healthcare costs and Mr. Stein's termination, (2) the temporal proximity between Kay Miller's comments to Lee Reimer and Mr. Stein's termination, and (3) the temporal proximity between the significant changes made to Defendant's healthcare plan and stop-loss coverage and Mr.

Stein's termination.

While Defendant emphasizes Jordan experienced high medical claims for hospitalizations in 2013 and was terminated in 2014, Defendant fails to acknowledge that it was still processing claims for Jordan in 2014 that were incurred in 2013 and that Jordan would continue to incur medical expenses in 2014 and into the future. In fact, Jordan had a 3-4 week hospital say at the end of 2013, only about six months prior to Mr. Stein's termination. There is also temporal proximity between Kay Miller's conversation with Lee Reimer about Jordan's high healthcare costs and its effect on the company and Mr. Stein's termination. That conversation occurred only about a month prior to Mr. Stein's termination, which shows Jordan's healthcare costs were still a concern to Defendant at the time of Mr. Stein's termination. Finally, Defendant changed its stop-loss coverage deductible from $250,000.00 per individual to $100,000.00 per individual in June 2014, only a month prior to Mr. Stein's termination. Defendant also completely changed its healthcare plan design in January 2014, immediately following Jordan Stein's expensive year of hospitalizations, to decrease Defendant's healthcare costs.

4. *Mr. Stein can establish a prima facie case of retaliation under R.C. 4123.90*.

O.R.C. §4123.90 states, in relevant part:

No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer.

Mr. Stein may establish a prima facie case by showing (1) he was injured on the job; (2) he filed a claim for workers' compensation; and (3) he was discharged by Defendant in contravention of O.R.C. §4123.90 (i.e., a causal connection exists between his termination and his claim for workers' compensation). *Wilson v. Riverside Hospital,* 18 Ohio St.3d 8, 10 (1985). Defendant only challenges Mr. Stein's ability to establish the third element of his prima facie case: that he was terminated in contravention of O.R.C. §4123.90. "Generally, questions of an employer's motive and intent in discharging an employee are not susceptible to resolution in summary judgment proceedings." *Hoffman v. CHSHO, Inc.,* 12th Dist. Clermont County No. CA2004-09-072, 2005-Ohio-3909, ¶37.

In overcoming Defendant's motion for summary judgment, Mr. Stein is not required to present a "smoking gun." *Kent v. Chester Labs, Inc.,* 144 Ohio App.3d 587, 592 (1st Dist. 2001). Rather, the requirement that Mr. Stein demonstrate he was discharged in contravention of O.R.C. §4123.90 may be satisfied by circumstantial or direct evidence. *Id*. Even a mere inference of retaliation is sufficient to avoid summary judgment. *Randleman v. Dick Masheter Ford, Inc.,* 10th Dist. Franklin County, 1991 WL 224433, *3-4 (Aug. 22, 1991). In resolving claims under O.R.C. §4123.90, Ohio courts "use a flexible evidentiary test for purposes of assessing retaliatory behavior," looking at the "before and after picture." *Hohn v. Deco Tools, Inc*., 6th Dist. Lucas County No. L-86-119, 1987 WL 5554, *3 (Jan. 23, 1987). Thus, the Court must examine the circumstances of Mr.

Stein's employment before and after he filed for workers' compensation in assessing whether there is evidence that Defendant violated O.R.C. §4123.90.

> The factors for a trier of fact to consider in making this determination include:
>
> punitive action such as bad performance reports surfacing immediately after a workers' compensation claim was filed, the length of time between the claim and the discharge, changes in salary level, hostile attitudes emerging, and whether legitimate reasons exist for the discharge….Summary judgment based on affidavits of employees and interested witnesses is inappropriate on the issue of intent.***Indeed, summary judgment is rarely appropriate at all on the issue of intent.

*Id.* (internal citations and quotations omitted). "The prima facie case in claims under R.C. 4123.90 does not present an onerous burden for plaintiffs' it is, indeed, easily met." *Scalia v. Aldi*, Inc., 9th Dist. Summit County No. 25436, 2011-Ohio-6596, ¶14 (citing *Dover v. Carmeuse Natural Chems.*, 5th Dist. No. 10-CA-8, 2010-Ohio-5657, at ¶ 43).

A reasonable jury could find a causal connection exists between Mr. Stein's termination and his workers' compensation claim since Defendant failed to accommodate Mr. Stein prior to his surgery and since the reason for his termination is not legitimate. First, Mr. Stein received hostility from Mark Toeppe after filing his workers' compensation claim and being placed on light duty restrictions. On several occasions, Mark Toeppe refused to accommodate Mr. Stein's restrictions and required him to work outside of his restrictions. In fact, Mr. Stein complained to both Jamie Halbisen and Mark Toeppe that they were making him work outside of his restrictions. In fact, Mark Toeppe told Mr. Stein that there were no jobs that could meet his restrictions and that he would not just be sitting around on his butt. In addition, Mr. Stein was terminated while still pursuing his workers' compensation claim and immediately following his apparent release to return to work with restrictions. Accordingly, issues of material fact exist as to whether Mr. Stein was terminated in

23

retaliation for his workers' compensation claim.

Second, Defendant claims it terminated Mr. Stein's employment because he violated the three-day no call/no show rule when he failed to return July 21, 2014 to perform light duty work. However, Ohio's workers' compensation law provides that an employer can only terminate an injured employee's Temporary Total Disability compensation "when the employer makes a good-faith job offer to the injured worker, which is within the injured worker's restrictions." *State ex rel. Price v. Indus. Comm.,* 2010-Ohio-2976, ¶ 22. Ohio Adm. Code 4121-3-32(A)(6) defines "job offer" in the Ohio workers' compensation context as follows:

> (6) "Job offer" means a proposal, made in good faith, of suitable employment within a reasonable proximity of the injured worker's residence. If the injured worker refuses an oral job offer and the employer intends to initiate proceedings to terminate temporary total disability compensation, the employer must give the injured worker **a written job offer** at least forty-eight hours prior to initiating proceedings. The written job offer shall identify the position offered and shall include a description of the duties required of the position and clearly specify the physical demands of the job. If the employer files a motion with the industrial commission to terminate payment of compensation, a copy of the written offer must accompany the employer's initial filing. (emphasis added)

Thus, an employee is only required to return to light-duty work from a work-related injury (and cease receiving Temporary Total Disability compensation) if the employee accepts a written job offer from the employer identifying the position offered with a description of the duties required of the position and a specification of the physical demands of the job. In this case, Defendant did not extend Mr. Stein an oral or written offer of work within his physical capabilities. Instead, Defendant required Mr. Stein to report to work only based on his physician's statement that he could perform office work. Since Mr. Stein did not report to work, Defendant's position is that Mr. Stein voluntarily abandoned his position and was rightfully terminated.

24

However, Ohio workers' compensation law plainly provides that "a claimant can abandon a former position or remove himself or herself from the workplace only if he or she has the physical capacity for employment at the time of the abandonment or removal." *State ex rel. OmniSource Corp. v. Indus. Comm.*, 2007-Ohio-1951, ¶ 10, 113 Ohio St. 3d 303, 305, 865 N.E.2d 41, 43–44 (quoting *State ex rel. Brown v. Indus. Comm.* (1993), 68 Ohio St.3d 45, 48, 623 N.E.2d 55. Since Mr. Stein was not medically able to return to his former position for employment and was only cleared for light-duty work, the law provides he could not have abandoned his position. Accordingly, Defendant's reason for Mr. Stein's termination is nonsensical from a workers' compensation standpoint as the effect of the physician's release without a written offer from the employer is to extend Mr. Stein's eligibility for Temporary Total Disability compensation.

C.  <u>A reasonable jury could find Defendant's proffered reason for Mr. Stein's termination is merely pretext for retaliation and/or discrimination.</u>

Mr. Stein can establish pretext by one of three ways, by showing (1) that the proffered reason has no basis in fact; (2) that the proffered reason did not actually motivate his discharge; or (3) that the proffered reason is insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chemical Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The first showing consists of evidence that the reason for plaintiff's discharge never happened, i.e., that it is factually false. *Id.* Under the second method, pretext can be shown by demonstrating circumstances which tend to prove that an illegal motivation was more likely than that offered by Defendant. *Id.* In effect, "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that [Defendant's] explanation is a pretext, or coverup." *Id.* The third showing under *Manzer* consists of evidence that other employees were not fired even though they engaged in substantially similar conduct to that which Defendant contends motivated Mr. Stein's discharge. *Id.*

25

Defendant's articulated, non-discriminatory reason for Mr. Stein's discharge is that it terminated Mr. Stein after he failed to call in or report to work for three consecutive days in violation of Article 1 Section 10 of the Attendance Policy. (Defendant's Motion for Summary Judgment, 16). However, a reasonable jury, with all reasonable inferences drawn in Mr. Stein's favor, could find Defendant's articulated reason to be pretext for retaliation or discrimination. In addition to the fact that Defendant's reason for Mr. Stein's termination does not make sense from a workers' compensation standpoint, a reasonable jury could also find pretext where (1) Defendant provides no evidence that Mr. Stein is comparable to other employees terminated under the three-day no call/no show rule; (2) Defendant did not call Mr. Stein on the first day he missed even though Defendant has called other employees for not showing up to work when expected; and (3) Defendant did not actually have light-duty work available for Mr. Stein on July 21, 2014.

1. **Mr. Stein is not comparable to other employees terminated under the three-day no call/no show rule.**

Mr. Stein was a loyal long-term employee of Defendant. He received awards for perfect attendance, routinely agreed to work overtime, and had never before received discipline for absenteeism. In addition, Mr. Stein was off work on approved medical leave immediately prior to his termination. This was not a situation where an employee was at work one day and simply failed to report to work or call in the next day. Defendant claims it enforces its no call/no show policy consistently and that 55 employees have been terminated under the policy since 1997. [Miller Affidavit, 11, Exhibit D]. In support of this statement, Defendant included a list of the names of the individuals terminated under the policy. [*Id*.]. However, the list does not provide any information about the individuals to indicate whether they are similarly situated to Mr. Stein. The list does not provide years of service or disciplinary history and, most importantly, does not provide whether the

individual was on FMLA leave immediately prior to the absences, had a workers' compensation claim pending, or had astronomical healthcare costs attributable to them. [*Id.*]. As a result, the list is irrelevant and should not be considered for summary judgment purposes.

> 2. **Defendant did not call Mr. Stein on July 21, 2014, the day Defendant expected him to return from leave, but has called other employees when they did not show up to work when expected.**

A reasonable jury could also find pretext based on the fact that Defendant did not call Mr. Stein on July 21, 2014, the day it allegedly expected him to return to work, which would have prevented him from violating the three-day no-call/no show rule. Defendant claims it does not call people when they do not come in for work. However, Mark Toeppe, the named decision-maker, admitted to calling employees if they miss work:

Q:    Have you ever called an employee and asked them why they're not at work?
A:    If I really needed them there that day, yes, I have.
Q:    Okay. Which employees?
A:    I can't name them.
Q:    Okay.
A:    Just I expect somebody to be there, do a job, and if they don't show up, I call them and ask what's up.
Q:    Okay. Then why didn't you do that for Rob?
A:    Because he was not assigned a job that was going to be anything to do with stopping line work and stopping other – you know, inhibiting other people from doing their job.

***

Q:    Have you ever called Randy Kuyken?
A:    Yeah.
Q:    How many times?
A:    Can't tell you that.
Q:    Have you called him and asked him why he's not at work?
A:    Yes, I have.
Q:    Is he related to you in some way?
A:    Yes. He is my brother-in-law.
Q:    At the time that you were calling him and asking him why wasn't he at work, did he own a bar?

27

A:     Yes.

Thus, it is not true that Defendant *never* called employees if they missed work. Rather, Defendant *chose* not to call Mr. Stein even though he was a dedicated employee with no history of absenteeism. Based on Mark Toeppe's testimony, an employee is called if the absence will affect other employees' work, but is not called if the employee is returning from a work-related injury with light duty restrictions because that employee is not *needed*.

### 3.  Defendant did not have light-duty work available for Mr. Stein on July 21, 2014.

Additional evidence that Defendant's proffered reason is pretext is that Defendant did not actually have "office work" available for Mr. Stein on July 21, 2014. Defendant claims it was ready for Mr. Stein's return to work on July 21, 2014 and had work to meet his restrictions, but Defendant did not actually have work available meeting those requirements. Defendant identified the following as being the light duty work available to Mr. Stein on July 21, 2014: 1. Update all MSDS books to be current with all MSDS files; 2. Inventory and catalogue all Niles Machine Parts received from Caterpillar; 3. Train new operators as needed when they came in; and 4. Main position would be in the Stockroom as Tool Grinder, until he was back to full duty work. [Toeppe Depo., Ex. 9].

However, Steve Clark admitted that updating all MSDS books to be current with all MSDS files would require going to and from the production floor, which is not compatible with Mr. Stein's office work only restriction. Steve Clark also admitted that training involves training new operators on their assigned operation on the production floor, which also did not meet Mr. Stein's restrictions. Finally, Mark Toeppe admitted that the Tool Grinder position was not suitable for Mr. Stein. In fact, when Mr. Stein was restricted to light duty work prior to his surgery, Toeppe considered placing Mr. Stein in the Stockroom as a Tool Grinder but after speaking with the Stockroom Attendant decided it

was not a viable option as the stockroom would be too crowded. [Toeppe 151-152]. Despite knowing the Tool Grinder position was not a viable light duty option, Defendant claims it was going to be Mr. Stein's main position until returned to full duty work.

## III. CONCLUSION.

Based on the foregoing, there are genuine issues of material fact regarding whether Mr. Stein's termination were motivated by retaliation and/or discrimination. Additionally, Defendant has not addressed Mr. Stein's ERISA interference claim in its Motion and therefore, it should not be dismissed.

Respectfully submitted,

*s/Diana M. Robinson*
Diana Robinson (0086642)
Widman & Franklin, LLC
405 Madison Ave., Suite 1550
Toledo, Ohio 43604
Ph.: (419) 243-9005
Fax: (419) 243-9404
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing Memorandum In Opposition to Defendant's Motion for Summary Judgment was filed electronically on January 16, 2017.  Notice of this filing will be sent to Counsel for Defendant, by operation of the Court's electronic filing system.

*s/ Diana M. Robinson*
Diana M. Robinson