# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Robert C. Stein,

       Plaintiff,                       Case No. 3:15CV00112

       v.                            **ORDER**

Atlas Industries, Inc.,

       Defendant.

This case arises out of defendant's alleged wrongful termination of plaintiff, one of its long-term employees. Defendant Atlas Industries, Inc. maintains it terminated plaintiff Robert Stein because of his failure to comply with the company's no call/no show attendance policy. Plaintiff, however, alleges his termination violated the Family and Medical Leave Act (FMLA), Employee Retirement Income Security Act (ERISA), and Ohio Revised Code.

Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367.

Pending is defendant's motion for summary judgment. (Doc. 68).[1]

---

[1] Also pending are two other motions.

First is defendant's motion to strike reference to inadmissible evidence cited in plaintiff's opposition to defendant's motion for summary judgment. (Doc. 74). Defendant objects to plaintiff's citation to: 1) statements made by defendant employees regarding plaintiff's son's serious medical issues and resulting high healthcare costs/claims; and 2) Exhibit 29, a Monthly Financial Report. With respect to the statements, I agree with plaintiff and deny defendant's motion to strike. Plaintiff does not offer these statements "to prove the truth of the matter asserted," Fed. R. Evid. 801(c), but rather, introduces them to serve some other purpose–namely, as circumstantial evidence of defendant employees' state of mind regarding plaintiff's son's medical issues and resulting healthcare costs/claims. Plaintiff offers these statements for the inferences that can be drawn from the fact that the words were spoken and not for the truth of what was said. Thus, the statements are not hearsay, and I may consider them. With respect to Exhibit 29, I again agree with plaintiff

For the reasons that follow, I grant the motion.

## Background

### A. Plaintiff's Employment with
### Defendant and Workplace Injury

Plaintiff Robert C. Stein was an employee of defendant Atlas Industries, Inc. for nearly twenty years. Plaintiff started his career at defendant's Fremont, Ohio plant on August 5, 1996. During his employment, plaintiff received positive performance evaluations and regular wage increases and had a nearly nonexistent disciplinary record. Plaintiff started as a Drill Operator, and after completing defendant's machinist apprenticeship program, defendant promoted him to Journeyman Machinist.

On December 23, 2013, plaintiff injured his left knee at work when he stepped off a platform to get a drill, caught his foot on a table, and twisted his knee. Plaintiff reported his injury that day and sought medical treatment on January 8, 2014. Mark Toepee, the Plant Manager, told plaintiff there would be no issue with his treatment and did not prohibit plaintiff from seeking that treatment. Following the January 8, 2014 appointment, plaintiff was released to work with the following

---

and deny defendant's motion to strike. Deponent Kay Miller, defendant's Human Resources Director and a witness with knowledge of the document, discussed Exhibit 29 during her deposition. I find Ms. Miller's testimony sufficient to show that Exhibit 29 is what plaintiff claims it to be. Fed. R. Evid. 901(b)(1). For authentication purposes, it does not matter that another individual, here, Maurice Clark, did not have knowledge of this document. I note, however, that even when considering the statements and exhibit to which defendant objects as admissible summary judgment evidence, I still find dismissal proper, as plaintiff fails to demonstrate a genuine issue of material fact for each of his claims.

Second is plaintiff's motion for leave to file a sur-reply. (Doc. 76). I grant that motion and have considered the arguments made therein in adjudication of defendant's motion for summary judgment. I also note that I do not rely on the "honest belief" doctrine–the issue that plaintiff's sur-reply addresses, in my decision to grant defendant's motion for summary judgment, as plaintiff's FMLA claims fail for other reasons.

restrictions: no lifting, no bending, no twisting, no turning, no lifting 30-40 pounds, no kneeling, and no squatting.

According to defendant, plaintiff was placed on light duty, where he worked within his restrictions through May 13, 2014. During that time, defendant maintains that Mr. Toepee granted each of plaintiff's accommodation requests. Defendant also maintains that it never disciplined plaintiff for any reason, nor did it tell plaintiff he could not work because light duty assignments within his restrictions were not available.

Plaintiff presents a different version of the facts relevant to this time period. According to plaintiff, defendant failed to adhere to plaintiff's restrictions. Plaintiff asserts defendant expected him to perform his normal job and ignored his complaints about performing tasks outside his restrictions. On one occasion, plaintiff asserts Mr. Toeppe told plaintiff that there were no jobs that could meet his restrictions and that plaintiff would not be sitting around on the job.

On May 13, 2014, plaintiff had surgery for a torn meniscus, rendering him totally unable to work and eligible for FMLA leave, which defendant approved. After surgery, plaintiff regularly followed up with his physician and waited to receive his release to return to work. From the date of plaintiff's surgery through July 18, 2014, defendant provided plaintiff FMLA leave. While on medical leave, plaintiff also received workers' compensation benefits.

### B. Defendant's Policies and Procedures Regarding Absences and Sick Leave

Article IX, Section 6 of defendant's Associate Handbook provides defendant's sick leave policy. It makes clear that an employee returning from leave for an illness or injury must be available

for assignment on the first regular workday following his or her medical release to return to work.

Specifically, Article IX, Section 6 states:

> An associate unable to report to work for more than four (4) consecutive workdays because of his illness or injury may be granted a sick leave. When the Company approves a sick leave, that absence is for a specific period of time based on medical verification by the associate's physician, indicating that the associate is physically unable to perform work due to illness or injury.
>
> An associate on sick leave is expected to notify the Company in advance of his expected date of return and before returning to work to report to their plant office with a statement from his physician stating that he is physically able to resume work. *He is required to be available for assignment on the first scheduled regular workday following expiration of his leave.*

(Doc. 68, 1-2) (emphasis added).

Of note, Article IX, Section 3 of the Handbook provides that FMLA leave runs concurrent to sick leave.

Additionally, Article I, Section 10 establishes the procedure for reporting absences.

Specifically, Article I, Section 10 states:

> *An associate who is unable to report to work is expected to inform his supervisor by calling the plant as early as possible and preferably before the start of their shift (but no later than one hour after start of your shift) on the first day of the absence and each day of absence until granted sick leave or a leave of absence.* Be sure to tell your supervisor the reason for your absence or tardiness.
>
> If you are absent three (3) or more consecutive days, due to illness, when you return to work, you must provide a statement from the doctor stating the following: a. treatment date(s), b. date(s) disabled, c. return to work date, d. doctor's signature. *Any associate who is absent three (3) consecutive days without permission or without calling in will be automatically discharged and it will be noted in your permanent record.*
>
> Remember, it is your responsibility to be on the job and keep the Company advised when you are unable to work, whatever the reason. Your absence can create quite a hardship not only for your fellow associates, but for the Company as well.

(*Id.*, 2) (emphasis added).

The Handbook also considers an absence for three consecutive workdays as an "intolerable offense" subject to dismissal. (*Id.*).

At the time of his hire, plaintiff reviewed defendant's Handbook, which included each of the above-listed policies, and plaintiff received updated versions of the Handbook throughout his employment. Further, plaintiff had taken medical leave multiple times in the past, showing his familiarity with the leave and absence policies.

Defendant claims it consistently enforces the no call/show policy by terminating employees who violate the policy.

### C. Plaintiff's Termination

On Friday, July 18, 2014, plaintiff had an appointment with Dr. Nabil Ebraheim's physician assistant, Gregory Otto.

According to defendant, Mr. Otto released plaintiff to return to work. The work release was effective July 20, 2014 and listed an "office work only" restriction applicable through August 10, 2014. Defendant maintains that Mr. Otto listed "office work only" as the restriction in order to limit plaintiff from participating in work that required lifting, bending, and prolonged standing. Mr. Otto did not, defendant argues, intend for this restriction to require plaintiff to perform solely "office" work functions. Instead, Mr. Otto intended only to limit plaintiff generally to "sit-down-type work" within his particular job assignment upon his return to work on July 21, 2014–the first scheduled regular workday following expiration of his leave and the date defendant expected plaintiff's return.

Plaintiff says otherwise. According to plaintiff, at the July 18, 2014 appointment, Mr. Otto said, "Rob, I'm keeping you off until August 10th so they have—maybe have your shots approved.

And if not, at that time, then maybe office work only. And when I say that, I say answering the phone only." (Doc. 72, 8). Then, Mr. Otto gave plaintiff a medical slip, which plaintiff took to the workers' compensation office. After leaving that appointment, it was plaintiff's understanding that he was not released to work until August 10, 2014.

Defendant received a medical report associated with plaintiff's workers' compensation claim indicating plaintiff was released to return to work with light duty restrictions on July 20, 2014. Defendant claims it intended to accommodate plaintiff's light duty restrictions in the same manner it had done after the work-related injury and before his surgery. Based on this information, defendant argues that plaintiff should have reported to work on July 21, 2014 to receive the light duty assignment defendant intended to give him.

Plaintiff, however, did not report to work or call in on Monday, July 21, 2014. And plaintiff did not report to work or call in for the next three days. From July 21, 2014, to July 24, 2014, plaintiff did not communicate with defendant at all about his medical condition or indicate that he intended to remain off work after the anticipated July 21, 2014 return date. Further, plaintiff did not provide defendant with any medical documentation to change his return date or discuss a continued need for medical leave beyond July 20, 2014.

On July 21, 2014, defendant's Human Resources Director, Kay Miller, contacted plaintiff's physician's office to confirm plaintiff received notice of his relea se to return to work. The physician's office provided Ms. Miller with a copy of plaintiff's return to work slip, which released him to work with restrictions effective July 20, 2014, and verified that plaintiff received the same document during his last visit with Mr. Otto. Then, Ms. Miller confirmed with defendant's Third

Party Administrator for workers' compensation claims that there were no medical reports modifying plaintiff's medical leave to extend it beyond July 20, 2014.

On July 24, 2014, Mr. Toeppe called plaintiff at home and asked him to come to work to discuss his absences. On July 25, 2014, plaintiff met with Mr. Toeppe. First, Mr. Toeppe told plaintiff that work was available for him that fit his light duty restrictions. Then, Mr. Toeppe said that plaintiff was being terminated due to his violations of Section 10 of the Attendance Policy. Plaintiff was shocked to learn of his termination, claiming he did not know defendant expected him back to work. Plaintiff then requested to see either Steve Clark, Vice President of Operations, or Kay Miller. Mr. Clark joined the meeting and concurred in plaintiff's termination, ending the meeting.

### D. Defendant's Employee Medical Plan and Plaintiff's Son's Medical History

When plaintiff was an employee, defendant had a self-funded Employee Health Benefit Plan ("Plan") that provided healthcare and prescription drug coverage to qualified and eligible employees. Pursuant to the Plan, defendant paid for participants' medical claims as incurred instead of paying a fixed premium to an insurance provider. Defendant also had stop-loss coverage for claims exceeding its deductible threshold–$250,000–meaning the stop-loss carrier reimbursed defendant for any claims incurred after the Plan paid out $250,000 for a particular individual in that plan year. In other words, defendant paid all claims out of its general fund, including those in excess of $250,000, and then defendant could apply for reimbursement for any claims exceeding $250,000.

According to defendant, it is not unusual for the Plan to experience large medical claims in a particular plan year. For plan year 2012, for example, defendant's total annualized claims cost for all employees was approximately $2.5 million. In plan year 2013–the year that covered plaintiff's

son's extended hospitalizations, which I discuss below,–defendant's total annualized claims cost experienced a 26% decrease to approximately $1.9 million.

Defendant has an internal benefit committee to make decisions regarding its health plans and stop-loss coverages. In 2013 and 2014, the following individuals made up the committee: Mr. Maurice Clark, Chief Financial Officer; Jerald Clark, President; and Kay Miller.

When making these decisions, the committee considers recommendations from its Third Party Administrator. From January 1, 2010 through May 31, 2014, Employee Benefit Management Corp. (EBMC) was defendant's Third Party Administrator. Effective June 1, 2014, Medical Benefits Administrators, Inc. replaced EMBC.

Further, and of significance to this case, defendant states that the committee does not consider individual employee claims, but rather considers defendant's overall healthcare costs in the aggregate.

Defendant divides the aggregate total of its annual claims costs each fiscal year among the operating budgets of its three Ohio locations–Tiffin, Fremont, and Gibsonburg–according to the number of employees at each location. Thus, defendant explains, "if 30% of Atlas employees work at the Fremont location, Atlas assigns 30% of the Company's total healthcare costs to that operating budget without regard to where the costs actually originated." (Doc. 68, 8). In other words, specific claim amounts for employees at a particular location do not affect the healthcare costs assessed to that location's operating budget; instead, those healthcare costs represent each location's proportionate share of total costs according to the percentage of employees working at that location. Defendant claims that its supervisors and plant managers have no knowledge of which employees submit health claims or the total amount of claims generated by any employee. Supervisors and plant

managers only have access to a lump sum amount, which represents the amount allocated to the operating budget of their location.

The Plan covered plaintiff and his family members throughout the entirety of his employment with defendant from 1996 through 2014. Specifically, the Plan insured plaintiff's son, Jordan Stein, as a dependent. Shortly after his birth, doctors diagnosed Jordan with a serious medical condition that caused him to suffer from seizures and cerebral palsy, as well as limitations in his functional abilities. The Plan covered Jordan's medical costs, which included hospitalizations and prescription medications, from the time of his birth through plaintiff's termination.

In January, 2013, Jordan was hospitalized for pneumonia. During that hospitalization, doctors placed Jordan on a ventilator, and he also suffered cardiac arrest as a result of a central line being placed in his neck. Jordan remained hospitalized until April, 2013. However, just four days after his release, Jordan returned to the hospital, was placed back on the ventilator, and remained hospitalized until the end of April, 2013. Jordan returned to the hospital again in November, 2013, was placed back on the ventilator, and remained hospitalized until approximately the end of 2013. Jordan was not hospitalized in 2014–the year defendant terminated plaintiff.

The Plan covered all of Jordan's 2013 hospitalizations. Specifically, according to a report from defendant's third party administrator, defendant had paid $193,141.51 in healthcare costs for Jordan through the second quarter. As noted above, this report did not include employee names with respect to the healthcare costs. However, despite the exclusion of names, the parties dispute whether defendant–namely, members of the internal benefit committee and Mr. Toeppe–had knowledge of Jordan's high healthcare costs in 2013. Defendant argues it had no knowledge that Jordan's hospitalizations were the reason for the high healthcare costs in 2013, while plaintiff argues it was

not difficult for defendant to identify the high claim individuals based on other information included in the reports.

In addition, plaintiff alleges that in 2013, employees and managers commented on Jordan's healthcare costs, further evidencing defendant's knowledge of Jordan's cost to the company.

Plaintiff alleges that Steve Clark, Vice President of Operations and part-owner, complained to him about Jordan's healthcare costs in March, 2013. In a conversation with Mr. Clark, plaintiff claims he mentioned the gas costs incurred to visit Jordan in the hospital, and Mr. Clark's response was, "Believe me, Rob, it's getting expensive for all of us." (Doc. 72, 3). Similarly, plaintiff claims that in May, 2013, after telling Mr. Clark he hoped Jordan would be released from the hospital soon, Mr. Clark stated, "We all do, because it is getting kind of costly." (*Id.*).

In addition to Mr. Clark, plaintiff alleges that Kay Miller made similar comments. According to plaintiff, Ms. Miller insisted on receiving a copy of plaintiff's divorce papers, stating that she needed to determine whether plaintiff was responsible for covering Jordan's healthcare "to protect [Atlas] because it was getting very costly." (*Id.*). Plaintiff also alleges that Ms. Miller discussed Jordan's healthcare costs with another Atlas employee, Lee Reimer, who also happens to be Jordan's grandfather. In a June, 2013 meeting regarding Mr. Reimer's healthcare options, Mr. Reimer mentioned increased cost of healthcare for employees. In response, Ms. Miller allegedly pulled out a set of papers and stated, "This is why our health insurance is going up. We have had three astronomical payouts." Ms. Miller then showed Mr. Reimer two documents–the first listed Mr. Reimer's healthcare costs, amounting to $80,000, and the second listed Jordan's healthcare costs, amounting to nearly $1,000,000.

Along with management, fellow employees allegedly made comments about the likelihood of receiving raises and the increased healthcare costs to employees, blaming plaintiff. In a May, 2012 posting, defendant made the following statement to its employees: "Medical Benefits – Some factors are out of your control. Since Obama care has been implemented, the cost of medical care has skyrocketed. Because we are self-insured these costs come directly from the Atlas bottom line and affect Atlas's ability to give rate increases." (*Id.*, 4). In a December, 2012 posting, defendant stated, "Medical Benefits – Two factors have dramatically affected our benefits plan: Obamacare and our claims experience. Because of these factors effective 1/1/2013, we will have to implement a slight increase in the cost to our employees." (*Id.*).

In response to those postings, plaintiff asserts he overheard a conversation between employees Duncan Harman, Bob Maynard, and Rick Smith in which Mr. Maynard allegedly said, "It's Rob's fault," to which Mr. Harman allegedly responded, "Yeah, gee, thanks, Rob, since your boy was in the hospital we're not going to get a raise." (*Id.*). Further, after plaintiff's termination, another employee, Ray Hugill, allegedly told plaintiff he was terminated because of Jordan's healthcare costs and could probably return to work if he agreed not to cover Jordan on his insurance.

In 2014, defendant significantly changed its stop-loss coverage.

First, defendant lowered its deductible level from $250,000 to $150,000. That change required defendant to provide the insurer with large claim reports, listing any covered individual who incurred healthcare costs exceeding $10,000 in a plan year. The reports listed the Plan as having paid $17,190.99 in the 2012 plan year, $564,692.40 in the 2013 plan year, and $134,421.59 from December 2013 through May 2014–all for Jordan's healthcare. For the 2013 plan year, Jordan was the only covered individual with claims exceeding the deductible amount.

Additionally, defendant changed the design of its healthcare plan to lessen its financial burden. Prior to this change, all employees received coverage under the same schedule of benefits. Under the new plan, employees choose from four different benefits schedules with varying deductibles, coinsurance options, and out-of-pocket maximums. This change resulted in decreased costs to defendant and increased costs to employees.

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

### A. Plaintiff Fails to Demonstrate a Genuine Issue
### of Material Fact as to His FMLA Claims

### 1. FMLA §§ 2612(a)(1)-(2)

The FMLA entitles eligible employees to take up to twelve weeks of unpaid leave each year if an employee has a "serious health condition that makes the employee unable to perform the

functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is unlawful for an employer to "interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA]," 29 U.S.C. § 2615(a)(1), or "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). An employer violating § 2615 is "liable to any eligible employee affected" for damages and equitable relief, if appropriate. 29 U.S.C. § 2617(a)(1).

The Sixth Circuit recognizes two theories of recovery under the FMLA: "(1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004); *see also Arban v. W. Pub. Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003).

Plaintiff brings claims under both theories, alleging defendant interfered with and retaliated against him for exercising his FMLA rights when they terminated him. I address each FMLA claim separately and conclude plaintiff fails to demonstrate a genuine issue of material fact as to each.

### 2. FMLA Interference

Pursuant to the interference theory, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA–for example, a twelve-week leave or reinstatement after taking a medical leave." *Arban, supra,* 345 F.3d at 401 (internal citation and quotation marks omitted).

To prevail on an interference claim, plaintiff must demonstrate: 1) he was an eligible employee; 2) defendant was an employer under the FMLA; 3) he was entitled to leave under the FMLA; 4) he gave defendant notice of his intention to take leave; and 5) defendant denied him

FMLA benefits to which he was entitled. *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th Cir. 2013); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The employer's intent is not part of the interference analysis. *See Arban, supra,* 345 F.3d at 401 ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer."); *see also Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 511 (6th Cir. 2006) ("This inquiry is an objective one divorced from the employer's motives, with the central question being simply whether the employee was entitled to the FMLA benefits at issue.").

Here, only the last of those five elements is disputed–namely, whether defendant's termination of plaintiff denied him *the FMLA benefits to which he was entitled*. I agree with defendant that plaintiff cannot show defendant denied him FMLA benefits to which he was entitled.

Under both the FMLA and the Department of Labor regulations, interference with an employee's FMLA rights does not constitute a violation when the employer provides a legitimate reason for the alleged interference–one unrelated to the employee's exercise of FMLA rights. *See Thorneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005) ("As long as an employer can show a lawful reason, *i.e.,* a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights.").

The applicable federal regulation, for example, makes clear that an employer has the authority to impose and enforce notice and other procedural requirements against an employee claiming FMLA-protected leave unless unusual circumstances justify the employee's failure to comply with the employer's requirements. 29 C.F.R. § 825.302(d). Specifically, § 825.302(d) states:

An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. . . . An employee also may be required by an employer's policy to contact a specific individual. Unusual circumstances would include situations such as when an employee is unable to comply with the employer's policy that requests for leave should be made by contacting a specific number because on the day the employee needs to provide notice of his or her need for FMLA leave there is no one to answer the call-in number and the voice mail box is full. Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied.

*Id.*

"This language explicitly permits employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances." *Srouder, supra,* 725 F.3d at 614; *see also Sherrouse v. Tyler Refrigeration Corp.*, 2004 WL 1124722, *5 (N.D. Tex.) ("The FMLA does not protect an employee who violates her company's 'usual and customary notice and procedural requirement' regarding the duration of her leave."). Thus, a plaintiff who violates the employer's notice and procedural requirements cannot, as a matter of law, state a claim of FMLA interference without producing evidence that shows unusual circumstances. *Srouder, supra,* 725 F.3d at 614-15.[2]

---

[2] I note, however, that in the Sixth Circuit, in certain circumstances, "employers *cannot* deny FMLA relief for failure to comply with [the employer's] internal notice requirements." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 723 (6th Cir. 2003) (emphasis added). According to the Sixth Circuit, "the FMLA does not permit an employer to limit his employee's FMLA rights by denying them whenever an employee fails to comply with internal procedural requirements that are more strict than those contemplated by the FMLA." *Id.* at 720. In *Cavin*, the Sixth Circuit concluded that the defendant-employer's policy was inconsistent with the FMLA, which "state[s] that an employee with a foreseeable need for leave 'shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.'" *Id.* (quoting 29 C.F.R. § 825.302(c)).

Here, defendant's policy is consistent with the FMLA, as it merely requires an employee to communicate verbally to defendant if he or she plans to be absent from work.

My decision in *Morr v. Kamco Indus., Inc.*, 548 F. Supp. 2d 472 (N.D. Ohio 2008) is instructive.

In *Morr*, I granted summary judgment to the employer where the employee failed to notify the employer of her intention to extend her leave beyond the date stated in her initial FMLA documentation. There, the defendant's attendance policy stated, "if [an employee] is absent for two consecutive working days without notifying Kamco, [the employee] will be terminated as a voluntary quit." *Id.* at 475. Further, for an employee absent under approved medical leave, the policy stated:

> If the period of disability is extended past the date on the disability slip, [the employee] must notify the company within thirty (30) minutes of the start of [the employee's] shift or attendance points will accumulate . . . [, and] a new disability slip must be submitted within five (5) working days from the expiration of the previous disability slip.

*Id.*

The plaintiff in *Morr* submitted documentation that she would be on leave for six weeks after giving birth to her child, with an expected return date of May 7, 2007. *Id.* at 476. However, while on leave, the plaintiff's physician changed her return date to May 14, 2007–seven weeks after her child's birth. When plaintiff returned to work on May 14, 2017, the employer terminated her for absenteeism from May 7 through May 11. *Id.*

Ruling on the plaintiff's FMLA interference claim, I concluded:

> Under any interpretation of the facts in this case, Morr failed to meet Kamco's requirements and, more importantly, failed to meet the requirements of the FMLA. The documentation that Morr provided to her employer clearly stated that she planned to be on leave "6 wks post partum." Morr's failure to notify her employer that she planned to extend her leave violates the procedures outlined in the Associates' Handbook . . . .

*Id.* at 479-80.

Thus, the plaintiff in *Morr* was not "entitled to leave under the FMLA" for the additional week she remained off work and, therefore, could not prevail on her interference claim. *Id.* at 480-81.

Here, defendant required an employee "who is unable to report to work" to contact his or her supervisor no later than one hour after the start of his or her shift. This requirement applies to the first absence and each absence thereafter until the employee receives sick leave or a leave of absence. From July 21, 2014 to July 24, 2014, however, plaintiff missed work without calling in at all. On those four days, therefore, plaintiff failed to follow his employer's "customary notice and procedural requirements," 29 C.F.R. § 825.302(d), and he offers no "unusual circumstances" to excuse his non-compliance. Thus, plaintiff was not entitled to FMLA leave on those days, which means that defendant did not interfere with his rights under the statute when it terminated him.

Simply put, plaintiff failed to meet both defendant's requirements and those of the FMLA. The documentation Mr. Otto provided plaintiff clearly stated his leave period ended July 20, 2014. Further, the documentation provided to Ms. Miller from plaintiff's physician's office on July 21, 2014 stated plaintiff's release to work with restrictions was effective July 20, 2014. After meeting with Mr. Otto, plaintiff could have extended his leave to August 10, 2014, as he had not used the entire twelve weeks of FMLA leave. To do so properly under the FMLA, plaintiff needed only to provide verbal notice of the need for additional leave. *See* 29 C.F.R. § 825.302(c) ("An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.").

Further, pursuant to defendant's requirements, it was not defendant's responsibility to contact plaintiff regarding his absences or need for additional leave. Rather, it was plaintiff's responsibility to "keep the Company advised when [he is] unable to work, whatever the reason" and:

> inform his supervisor by calling the plant as early as possible and preferably before the start of [his] shift (but no later than one hour after start of [his] shift) on the first day of the absence and each day of absence until granted sick leave or a leave of absence.

(Doc. 68, 2).

Plaintiff claims he was unaware his leave ended on July 20, 2014, arguing it was his belief after leaving his appointment with Mr. Otto that his leave had been properly extended through August 10, 2014. This misunderstanding, while unfortunate, does not entitle plaintiff to relief under the FMLA. *See, e.g., Sherrouse*, *supra,* 2004 WL at *3 (holding plaintiff could not meet her burden of showing she was protected by the FMLA where her doctor did not fax her employer the notice of extension of disability and her employer terminated her "for failure to return to work and failure to notify the Company that she would be absent").

Finally, plaintiff produces no evidence demonstrating the type of "unusual circumstances" that would justify his failure to comply with defendant's verbal call-in requirement.

Plaintiff's undisputed lack of communication regarding his intent to extend his leave beyond the effective July 20, 2014 return date justified defendant's decision to rely on the information it received as to plaintiff's return date. Plaintiff's failure to take the simple steps required by defendant's notice and procedural requirements–a phone call no later than one hour after the start of his shift on each day he intended to be off work–resulted in his inability to bring his FMLA rights into existence. Thus, I hold plaintiff's FMLA protected leave ended on July 20, 2014.

Accordingly, plaintiff's absence from work the following week was just that–an absence. *See Alexander v. Ford Motor Co.*, 204 F.R.D. 314, 318 (E.D. Mich. 2001) ("An employee is no less absent without leave at the conclusion of a valid FMLA leave than they are during any other point

of their employment."). After three such absences, defendant was within its rights to terminate plaintiff's employment pursuant to the company's attendance policy.

Because plaintiff was not "entitled to leave under the FMLA" between July 21 and July 24, 2014, he cannot make out a claim for FMLA interference. Thus, with regard to plaintiff's FMLA interference claim, I grant defendant's motion for summary judgment.

### 3. FMLA Retaliation

Unlike the interference theory, the employer's intent *is* relevant under the retaliation theory. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998) ("[T]he employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate non-discriminatory reason."). This is so because "retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar, supra,* 443 F.3d at 508 (citing *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 885 (7th Cir. 2005)).

When there is no direct evidence of unlawful conduct, I evaluate retaliation claims under the "tripartite burden-shifting framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007); *Edgar, supra*, 443 F.3d at 508.

A plaintiff can establish a *prima facie* case of retaliation by showing that: "(1) [he or she] engaged in a statutorily protected activity, (2) [he or she] suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity." *Bryson, supra,* 498 F.3d at 570 (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)); *see also Edgar, supra,* 443 F.3d at 508.

If a plaintiff establishes the *prima facie* case, the burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *Bryson, supra*, 498 F.3d at 570; *Edgar, supra,* 443 F.3d at 508.

If the defendant proffers a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff to prove "the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson, supra*, 498 F.3d at 750; *Edgar, supra,* 443 F.3d at 508*; see also Skrjanc, supra,* 443 F.3d at 315 (requiring a claimant to show the employer's proffered reason was actually a "pretext to mask discrimination").

To prove pretext, a plaintiff must provide "sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994); *see also Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) ("A plaintiff must do more than simply impugn the legitimacy of the asserted justification for [his] termination . . . ."). A plaintiff can prove pretext by showing the employer's reason: 1) had no basis in fact; 2) did not actually motivate the decision to terminate; or 3) was insufficient to warrant the decision to terminate. *Manzer, supra,* 29 F.3d at 1084.

Here, there is no dispute that plaintiff was engaged in protected FMLA activity (his request and receipt of FMLA leave) and that plaintiff suffered an adverse employment action (his termination). At issue is whether there was a causal connection between plaintiff's exercise of his FMLA rights and his termination. On this element of the *prima facie* case, plaintiff cannot succeed.

Simply put, plaintiff fails to demonstrate a genuine issue of material fact exists as to the reason for his termination. Instead of producing any evidence showing that defendant fired him due to his exercise of his FMLA rights, plaintiff relied on random, albeit troublesome, comments about

the costs the company was incurring providing healthcare to him and his family. Random comments, particularly those made at a temporal distance from an employer's adverse action, do not establish pretext. *See, e.g., Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (finding that supervisor's remarks to plaintiff did not provide an inference of discriminatory intent and finding that such a conclusion would "require[] an inference that violates the fundamental rule that '[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient' to survive summary judgment") (quoting *Anderson, supra,* 477 U.S. at 252); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025-26 (6th Cir. 1993) (concluding age-related comments made a year before the adverse employment action were not evidence of pretext in age discrimination action).

In addition, and crucially, plaintiff has not presented evidence that the defendant did not enforce its attendance or FMLA-related policies as to other employees who, like plaintiff, breached those policies. The absence of evidence that the defendant treated employees who violated such policies more favorably than the plaintiff leaves plaintiff without meaningful evidence as to whether defendant's stated legitimate reason for firing him was untrue and offered as a pretext to mask discriminatory intent.[3] *See, e.g., Quinn-Hunt v. Bennett Enters., Inc.*, 2005 WL 2174053, *4 (N.D. Ohio) (holding that when plaintiff could not show similarly situated employees were treated differently, plaintiff failed to rebut her employer's legitimate, non-discriminatory reason for her termination).

As noted above in Section A.1, defendant terminated plaintiff because he failed to comply with defendant's notice and procedural requirements for calling off work. Plaintiff failed to report

---

[3] I also note that plaintiff does not allege any interference on the defendant's part during his earlier FMLA leaves.

to work or call in for three consecutive days–a clear violation of defendant's attendance policy and grounds for automatic dismissal.

In effect, plaintiff wants to shift the burden of communicating from himself to the company. There is no basis, in light of defendant's understandable expectation that its employees will tell it when they will not be at work, for plaintiff to expect the defendant to have presumed his absences were related to his medical condition.

Plaintiff seeks to hold defendant liable for violating the FMLA based on its decision to hold plaintiff accountable for clear violations of its unambiguous attendance policy. I decline to do so.

Because plaintiff cannot show a causal connection between his protected FMLA activity and the adverse employment action, he cannot make out a claim for retaliation. Thus, with regard to plaintiff's FMLA retaliation claim, I grant defendant's motion for summary judgment.

### B. Plaintiff Fails to Demonstrate a Genuine Issue of Material Fact as to His ERISA § 510 Claims

### 1. ERISA § 510

Under ERISA § 510:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 *et seq.*], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act. The provisions of section 1332 of this title shall be applicable in the enforcement of this section.

29 U.S.C. § 1140.

ERISA prohibits employers from: 1) retaliating against a person who avails himself or herself of an ERISA right; and 2) interfering with the attainment of ERISA rights. *Coomer v. Bethesda Hosp.*, 370 F.3d 499, 506 (6th Cir. 2004).

The employer's motivation is an integral element of a § 510 claim. The Sixth Circuit has held that to state a claim under § 510, an employee must demonstrate the employer had the specific intent to violate ERISA. *Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 537 (6th Cir. 2005); *see also Hamilton v. Starcom Mediavest Grp., Inc.,* 522 F.3d 623, 627 (6th Cir. 2008); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir.2001) (requiring a plaintiff to show the employer "had the specific intent of avoiding ERISA liability when it discharged him"); *Smith v. Ameritech,* 129 F.3d 857, 865 (6th Cir. 1997); *Abbott v. Pipefitters Local Union No. 522 Hosp., Med., & Life Benefit Plan*, 94 F.3d 236, 242 (6th Cir. 1996) (requiring a plaintiff to "demonstrate that the action at issue was taken with the specific intent to violate ERISA, *i.e.,* that a motivating factor in the defendant's action was the purpose of interfering with the plaintiff's entitlement to benefits"); *Rush v. United Techs., Otis Elevator Div.*, 930 F.2d 453, 457 (6th Cir. 1991).

In other words, the employee must show that the employer specifically intended either to: 1) retaliate against the plaintiff for the exercise of an ERISA-protected right; or 2) interfere with the plaintiff's attainment of a right to which he or she is entitled.

A plaintiff can prove the employer had the specific intent to violate § 510 by direct or indirect evidence. In the absence of direct evidence, as is the case here, an employee may seek to establish the *prima facie* case through indirect evidence. With cases supported by indirect evidence, I must employ the burden-shifting approach used by the Sixth Circuit in employment discrimination cases.

*Hamilton*, *supra,* 522 F.3d at 628; *Schweitzer, supra,* 413 F.3d at 537; *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043-44 (6th Cir. 1992).

First, plaintiff must establish a *prima facie* case of ERISA retaliation or interference by showing: 1) he engaged in activity protected by an employee benefit plan or ERISA; 2) he suffered an adverse employment action, and 3) a causal connection exists between the protected activity and the adverse employment action. *Hamilton, supra,* 522 F.3d at 628.

If a plaintiff proves a *prima facie* case, the burden then shifts to defendant to offer a legitimate, non-discriminatory reason for its adverse action. *Hamilton, supra*, 522 F.3d at 628; *Smith, supra,* 129 F.3d at 865. If the employer cannot make such a showing, I should rule in the plaintiff's favor. *Humphreys, supra,* 966 F.2d at 1043.

If, however, the employer asserts a legitimate motivation for its action, then the presumption of wrongfulness is eliminated. Plaintiff must then show that the reason defendant offered amounts to pretext for retaliation. *Hamilton, supra,* 522 F.3d at 628.

Summary judgment is proper if plaintiff fails to establish a *prima facie* case or fails to rebut the employer's proffered legitimate, non-discriminatory reason for its action. *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1413 (6th Cir. 1996).

## 2. Plaintiff Fails to Allege a *Prima Facie* Case
## of ERISA Interference or Retaliation

Here, plaintiff's claim can be construed as either retaliation or interference.[4] The allegation that defendant terminated plaintiff *because of* claims associated with Jordan's medical care reads as a retaliation claim; however, the allegation that defendant terminated plaintiff *to avoid* the payment of future benefits on Jordan's behalf reads as an interference claim. Although plaintiff does not allege that defendant interfered with his attainment of ERISA rights *during* his employment, plaintiff argues that defendant violated ERISA by terminating him in response to the high medical claims previously submitted on Jordan's behalf *and* to avoid payment of similar claims in the future.

Defendant does not dispute that: 1) plaintiff's submissions of medical claims in 2013 for Jordan's medical care were protected by his employee benefits plan; and 2) plaintiff's termination was an adverse employment action. The issue is whether a causal link exists between the two–plaintiff must show a causal link between defendant's action (*i.e.,* terminating plaintiff) and either the plaintiff's exercise of a right protected by his benefit plan (retaliation) or attainment of a right to which he is entitled under his benefit plan (interference). I find plaintiff failed to demonstrate

---

[4] Specifically, the complaint states: "Defendant's decision to terminate Plaintiff was motivated by the medical bills incurred in connection with Jordan Stein's healthcare treatment by the employee benefit plain in which Stein participated, Stein's exercise of rights under Defendant's healthcare insurance employee benefit plan, and Defendant's desire to deprive Stein of further access to the benefits under the applicable employee benefit plan and/or in retaliation for his receipt of benefits under said plan." (Doc. 32, ¶ 40).

I make this point because the parties seem to dispute the type of claim plaintiff asserts in his complaint, with plaintiff arguing defendant did not move for summary judgment as to his ERISA interference claim and defendant maintaining it included arguments applicable to both types of ERISA claims. However, whether the plaintiff alleges defendant retaliated against him for exercising an ERISA-protected right or interfered with his attempt to exercise such a right is inapposite. Both claims fall under § 510, and both claims require the causal link between plaintiff's protected activity and defendant's adverse employment action, which, as I discuss below, is fatal to plaintiff's claim.

a genuine issue of material fact as to causation, and, thus, he cannot make out a *prima facie* case of a § 510 violation.

As noted above, in the Sixth Circuit, a plaintiff seeking to prove that an employer discharged him or her in violation of § 510 must show that an employer acted with the specific intent to violate ERISA. *See, e.g., Schweitzer*, *supra,* 413 F.3d at 537; *Hamilton, supra,* 522 F.3d at 627; *Majewski, supra,* 274 F.3d at 1113. Simply put and fatal to plaintiff's ERISA claim is his failure to show defendant had the specific intent to violate ERISA when it terminated him.

First, the record fails to show that it is more likely than not that Mr. Toeppe, who was responsible for the decision to fire plaintiff, knew about plaintiff's ERISA-protected activities–namely, the costs of Jordan's medical claims. What Mr. Toeppe knew is relevant because "an employee's protected activities will be the cause of an employer's retaliatory conduct only where the employer knew of those protected activities." *Hamilton, supra,* 522 F.3d at 628 (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 n.2 (6th Cir. 1999) (stating that an employer's knowledge of an employee's conduct is "captured by the third prong [of the *prima facie* retaliation case]: the defendant must have known about the protected activity in order for it to have motivated the adverse action")).

Thus, Mr. Toeppe must have known the details of plaintiff's healthcare claims for them to have motivated his termination decision. It is clear that defendant's policy is to provide plant managers with the lump sum amount allocated to their respective facility's operating budget for *all* employees. This lump sum is not based upon the claims submitted by the employees at that plant, but rather the percentage of the defendant's overall employees at that particular facility. Further, the reports Mr. Toeppe reviewed did not include names of specific employees, but only the total amount

allocated to each facility. I am not persuaded by plaintiff's argument that Mr. Toeppe could have inferred or guessed from the lump sum or miscellaneous comments that it was Jordan's health care alone that required defendant to make large pay outs under the Plan in 2013.

I also note with respect to Mr. Toeppe that defendant's plant managers are not expected to control or limit healthcare costs at their respective facilities. Instead, healthcare costs are considered a fixed cost. As such, Mr. Toeppe did not have a personal motivation to terminate plaintiff in an effort to reduce the healthcare costs at the Fremont facility.

Further, the timing of the termination in relation to the ERISA-protected conduct negates plaintiff's claim that his termination was in retaliation for submitting claims for Jordan's medical treatment and hospitalizations. Temporal proximity, while not dispositive, is relevant to the causation analysis. *Hamilton, supra,* 522 F.3d at 629 ("Although no one factor is dispositive in establishing a causal connection, evidence that the adverse action was taken shortly after a plaintiff's exercise of protected rights is relevant to causation.") (internal citation and quotation marks omitted).

Here, approximately seven months passed between Jordan's last hospitalization period in 2013 and plaintiff's termination in July, 2014. This is not the type of temporal proximity sufficient to raise an inference of discriminatory intent. Also, Jordan's medical care and corresponding claims prior to 2013 are relevant. Jordan was born with a serious health condition in 2002, and he was a dependent under plaintiff's benefits plan for the entirety of plaintiff's employment. The parties do not dispute that from the time of Jordan's birth in 2002 through plaintiff's termination in 2014, defendant paid each and every claim related to Jordan's healthcare. Viewing the time lapse in that manner further attenuates the correlation between plaintiff's protected activity and termination and is insufficient to raise an inference of retaliation by defendant.

Finally, plaintiff's description of his work environment and the comments from management regarding the cost of Jordan's healthcare, while troubling, is insufficient to demonstrate causation. For over ten years (from Jordan's birth until plaintiff's termination), defendant never disciplined plaintiff or forced him to take a different job assignment due to Jordan's high health care costs. It is difficult to conclude that in 2014, months after Jordan's last hospitalization, defendant changed its mind about paying for Jordan's healthcare and decided to terminate plaintiff as a result. It is true that defendant changed its employee benefits plan with respect to employee healthcare, but an employer is allowed to make such strategic, business decisions and could have done so for a variety of reasons. Defendant may very well have decided it was in the company's best interest to modify its employee health insurance policy because of the significant costs it accrued in prior plan years. This decision, without additional proof, does not evidence the specific intent to violate ERISA that plaintiff must show to prevail on his § 510 claim.

Because plaintiff cannot show a causal connection between his ERISA-protected activity and the adverse employment action, he cannot make out a *prima facie* case under § 510. Thus, I grant defendant's motion for summary judgment.

### C. I Decline to Exercise Supplemental Jurisdiction Over Plaintiff's State Law § 4123.90 Claim

Plaintiff's remaining retaliation claim under O.R.C. § 4123.90 is not protected by federal law.

Supplemental jurisdiction is governed by 28 U.S.C. § 1367, which includes an explicit provision permitting the district court to decline to exercise supplemental jurisdiction when that court has dismissed all of the claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(1).

As plaintiff's federal claims cannot survive, I decline to exercise supplemental jurisdiction over any state law claims in this case.

### Conclusion

Because there is no genuine issue of material fact as to whether defendant violated the FMLA or ERISA, summary judgment is warranted. I decline to exercise supplemental jurisdiction over plaintiff's O.R.C. § 4123.90 claim.

It is, therefore,

ORDERED THAT:

1. Defendant's motion for summary judgment (Doc. 68) be, and the same hereby is, granted;

2. Defendant's objection and motion to strike reference to inadmissible evidence cited in plaintiff's opposition to defendant's motion for summary judgment (Doc. 72) be, and the same hereby is, denied; and

3. Plaintiff's motion for leave to file a sur-reply (Doc. 76) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge